IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ITG BRANDS, LLC,

      Plaintiff,

      v.

YELLOWSTONE CAPITAL, LLC; WORLD
GLOBAL CAPITAL d/b/a GRAND
CAPITAL FUNDING; CAPITAL
MERCHANT SERVICES, LLC; GREEN
CAPITAL FUNDING, LLC; MIDNIGHT
CAPITAL, LLC; DAVID GLASS;
YITZHAK STERN; TVSI DAVIS;
FUNDERZ.NET, LLC d/b/a HOP CAPITAL
d/b/a EMPIRE FUNDING d/b/a CHAMPION
FUNDING GROUP d/b/a REGION
CAPITAL d/b/a FUNDERS LINK; JOSEPH
YITZCHAKOV a/k/a JOSEPH ISAACOV;
and GAVRIEL YITZCHAKOV a/k/a. GABE
ISAACOV,

      Defendants.

CIVIL ACTION NO. 1:23-cv-5345

Plaintiff ITG Brands, LLC ("ITG"), by and through counsel, complains against Defendants

Yellowstone Capital, LLC ("Yellowstone"); World Global Capital, LLC ("World Capital") d/b/a

d/b/a Grand Capital Funding; Capital Merchant Services, LLC ("Capital Merchant"); Green

Capital Funding, LLC ("Green Capital"); Midnight Capital, LLC ("Midnight Capital")

(collectively, the "Yellowstone Entities"); David Glass ("Glass"); Yitzhak Stern ("Stern"), Tvsi

Davis ("Davis") (collectively, with the Yellowstone Entities, the "Yellowstone Defendants");

Funderz.net, LLC ("Funderz.net") d/b/a Hop Capital (a/k/a Hop Capital, LLC), d/b/a Empire

Funding, d/b/a Champion Funding Group, d/b/a Region Capital, d/b/a Funders Link; Joseph

Yitzachakov a/k/a Joseph Isaacov; and Gavriel Yitzachakov a/k/a Gabe Isaacov (the "Isaacovs"

and collectively, with Funderz.net, the "Funderz Defendants") as follows:

## **NATURE OF THE ACTION**

1.      This is a RICO action against two enterprises, comprising two networks of merchant cash advance ("MCA") companies, that engaged in loansharking schemes, collected unlawful debts, and otherwise fraudulently obtained millions of dollars from Zoom Insights, LLC ("Zoom"). Zoom should have been a profitable marketing firm, capable of paying its debts as they came due. But preyed upon through Defendants' loan sharking schemes, Zoom fell into financial ruin, descended into bankruptcy, and left its estate owing millions to creditors. Plaintiff ITG was Zoom's largest client and largest creditor. Aside from Zoom—which Defendants looted out of existence—ITG suffered the largest loss from Defendants' loan sharking schemes.

2.      From June 2017 until February 2019, the Yellowstone Entities—controlled and manipulated by Defendants Glass, Stern, and Davis—executed a series of "Secured Merchant Agreements" with Zoom pursuant to which they purportedly paid lump sums to purchase a percentage of Zoom's future receipts at a discount, and Zoom agreed to permit daily withdrawals from its accounts until the purported face value of the purchased receipts had been paid in full.

3.      Although framed as the purchase of future receipts, these agreements were in fact loans for which the Yellowstone Entities negotiated and demanded guaranteed repayment amounts that did not depend on the pace, amount, or even success of future collections. Acknowledging the transactions as the true loans they were, these agreements charged interest rates far exceeding the maximum 25% allowed under New York's usury laws—as high as 304% when calculated by reference to the face repayment amount and as high as 12,745% when taking fees and refinancing costs into account.

4.      After the Yellowstone Entities obtained over half a million dollars from Zoom through these usurious loans, the Funderz Defendants began their own scheme to bleed Zoom of its remaining assets. Beginning in December 2018, Funderz.net—operating under multiple alter

egos all controlled and manipulated by the Isaacovs—entered into a series of "Secured Merchant Agreements" with Zoom pursuant to which it purportedly paid lump sums to purchase a percentage of Zoom's future receipts at a discount, and Zoom agreed to permit daily withdrawals from its accounts until the purported face value of the purchased receipts had been paid in full.

5.      Like the Yellowstone agreements before them, in reality, the Funderz.net agreements were loans for which Funderz.net negotiated and demanded guaranteed repayment amounts that did not depend on the pace, amount, or even success of future collections. Recognized as the loans they were, these agreements charged effective interest rates far exceeding the maximum 25% allowed under New York's usury laws—as high as 5,775% when calculated by reference to the face repayment amount and as high as 18,682% when taking fees and refinancing costs into account.

6.      Through their loansharking activities, Defendants quickly forced Zoom into a crushing debt spiral. The unsustainably large daily withdrawals and usurious effective interest rates forced Zoom to take out more and more loans with increasingly onerous repayment obligations. Once caught in this downward debt spiral, like many individuals who borrow from loan sharks, Zoom was unable to crawl out from under its ever-increasing debt. Soon, Zoom was relying on these loans as the primary source of financing to pay its prior debt obligations. Eventually, by July 2019, Zoom collapsed under the weight of these usurious loans. When it did so, it owed millions of dollars to ITG.

7.      Zoom is not alone in falling prey to the schemes orchestrated by the Yellowstone Defendants and Funderz Defendants. Indeed, the Attorneys General of both New York and New Jersey each recently filed separate action against Yellowstone and its affiliates for their loansharking activities, alleging that the transactions they execute are disguised loans subject to

New York's usury laws. On December 27, 2022, the New Jersey Attorney General's Office entered into a Consent Order and Permanent Injunction with Yellowstone to return over $20,000,000 to borrowers and enjoining Yellowstone from using the types of unconscionable loan agreements used here.

8.     The amount of money obtained from Zoom by the Yellowstone Defendants and the Funderz Defendants through these loansharking enterprises is staggering.

9.     Between June 2017 and January 2019, the Yellowstone Entities advanced less than $700,000 to Zoom while collecting over $1.7 million. Despite collecting over a 100% return on its investment in just 19 months, World Global claimed that Zoom still owed it over $140,000. Indeed, in January 2020, World Global still was attempting to collect on this unlawful debt pursuant to UCC Section 9-406, demanding that Zoom's clients—including ITG—put a hold on their accounts with Zoom and remit funds directly to World Global.

10.     Similarly, between December 2018 and March 2019, Funderz.net advanced approximately $2.1 million to Zoom, while demanding that it repay nearly $3.8 million. By July 2019, when Defendants' exploitation caused Zoom to collapse, Funderz.net already had collected over $1.8 million. Yet despite receiving almost all of its advances back in less than eight months, Funderz.net still maintained it was entitled to an addition $1.9 million dollars. In December 2019, Funderz.net, operating under the assumed name Hop Capital, still was attempting to collect on this unlawful debt pursuant to UCC Section 9-406, demanding that Zoom's clients—including ITG— put a hold on their accounts with Zoom and remit funds directly to Hop Capital.

11.     Unaware that Defendants were bleeding Zoom dry, ITG advanced tens of millions of dollars to Zoom to cover expenses for Zoom's work on behalf of ITG. But rather than being used to cover Zoom's expenses for real work, much of this money was swept back out of Zoom's

accounts in the Defendants' daily draws in furtherance of their respective loan sharking schemes. When Zoom inevitably collapsed, ITG was left holding the proverbial bag. All told, ITG lost over three million dollars in Zoom's collapse.

12.     It is against this backdrop that ITG files this Complaint.

## PARTIES

13.     ITG is a limited liability company organized and existing under the laws of the State of Texas, with a principal place of business in Guilford County, North Carolina.

14.     Yellowstone is a limited liability company organized and existing under the Laws of the State of New York with a principal place of business in New Jersey.

15.     World Global is a limited liability company organized and existing under the laws of the State of New York with a principal place of business in New Jersey.

16.     Capital Merchant is a limited liability company organized and existing under the laws of the State of New York with a principal place of business in New Jersey.

17.     Green Capital is a limited liability company organized and existing under the laws of the State of New York with a principal place of business in New Jersey.

18.     Midnight Capital is a limited liability company organized and existing under the laws of the State of New York with a principal place of business in New Jersey.

19.     Upon information and belief, David Glass is an individual who resides in Florida.

20.     Upon information and belief, Yitzhak Stern is an individual who resides in New Jersey.

21.     Upon information and belief, Tsvi Davis in an individual who resides in New York.

22.     Funderz.net is a limited liability company organized and existing under the laws of the State of New York with a principal place of business in New Jersey.

23.     Upon information and belief, Joseph Isaacov is an individual who resides in Florida.

24.     Upon information and belief, Gabe Isaacov is an individual who resides in Florida.

25.     Non-party Zoom is a corporation that, until its 2019 collapse, was organized and existing under the laws of North Carolina. Certain assets of the Zoom estate—claims against the Defendants—have been purchased by ITG, such that ITG is successor in interest to Zoom with respect to those claims.

## JURISDICTION AND VENUE

26.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on ITG's claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. § 1961, *et seq.*

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred here.

28.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant is an entity organized and existing under the laws of the State of New York or an individual who has purposely availed himself of the jurisdiction of this Court for purposes of the specific transactions at issue in this lawsuit.

29.     Defendants' agreements contain applicable choice of law and venue provisions that specify that the agreements shall be governed by the law of New York and that any action arising under the agreements shall be instituted in "any court sitting in New York."

## FACTUAL ALLEGATIONS

### A.     The Predatory MCA Industry.

30.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," as "the interest rates can exceed 500 percent a year, or 50 to 100 times higher than

a bank's."[1] The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2] The MCA industry preys on small businesses desperate for quick influxes of cash, which quickly leads to dependency on additional advances, each with increasingly onerous terms. One small business owner described her decision to take merchant cash advances as "the worst possible decision you can ever make, because they own you," calling it "crack for a business. You can't get off of it."[3]

31.     The National Consumer Law Center has likened MCA companies to predatory payday lenders and noted that despite the industry couching its financing as short term, "the business model is based on a long term debt trap."[4]

32.     The fees and effective interest rates charged by MCA companies leave businesses with little chance to solve their liquidity issues. Instead, the crippling payment terms and depletion of new capital force businesses to return to the MCA company to refinance what is remaining on the original debt and assume more debt to cover their expenses.

33.     MCA companies themselves have little incentive to consider the long-term success of borrowers, as they "receive the bulk of their revenues from the origination process rather than from performance of the loan."[5] Additionally, because effective interest rates and daily draws are so high, MCA companies recoup their investment in a short time frame, with the actual return on

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2016, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[2] *Id.*
[3] *Id.*
[4] https://www.occ.gov/topics/supervision-and-examination/responsible-innovation/comments/comment-nclc-et-al.pdf (last accessed 5/10/23).
[5] *Id.*

investment driven primarily by how long they can prop up the business and extract value before its inevitable collapse.

34.     MCA companies care most about whether they can continue the cycle of loans and collect upon default, not whether the small business can survive.

**B.     The Yellowstone Defendants.**

35.     Upon information and belief, Yellowstone was co-founded in 2009 by David Glass.

36.     Upon information and belief, Stern is the former CEO of Yellowstone.

37.     Upon information and belief, Davis is the former Director of Underwriting at Yellowstone.

38.     Since its founding, Yellowstone has expanded its umbrella to include numerous other MCA companies that operate under its management and control but exist under other corporate names. These include Capital Merchant, World Global, and Green Capital.

39.     Additionally, World Global operates under a series of alter egos. According to the New York Department of State website, World Global currently operates or has operated under no fewer than 50 assumed names, including ABC Merchant Solutions, Brownstone Funds, Fast Cash Funding, Blue Rock Capital, One Funder, Three Tree Funding, and Grand Capital Funding.

40.     Within these companies, Yellowstone utilizes a network of sales officers and brokers to sell usurious loans to small businesses in need of cash advances to operate. Brokers are rewarded with a commission based upon a percentage of income generated for the Yellowstone Defendants.

41.     Although purported to be the purchase and sale of future receivables, Yellowstone's MCA agreements actually are loans charging interest rates in violation of New York usury laws, as explained more fully below.

42.     Brokers and sales officers affiliated with the Yellowstone Defendants regularly refer to the agreements as "loans." Among other things, they represent to small business owners that the "loans" are merely "bridge loans" to provide liquidity while the broker works to secure longer-term financing at lower interest rates.

43.     In reality, however, there never is any plan to secure long-term, low-interest rates or create long-term success for the small businesses. Instead, the goal is to keep the businesses surviving, albeit barely, by trapping it in a cycle of high-interest, short-term loans. As the cycle continues, more and more of the proceeds of the new loans are used to pay off prior loan balances. This allows the Yellowstone Defendants to extract as much money as possible in interest and fees before the business finally collapses.

44.     At that point, the Yellowstone Defendants file confessions of judgment against the individual guarantors on the loans and continue to pursue collection from the business owners.

**C.     The Funderz Defendants.**

45.     Joseph and Gabe Isaacov are brothers who own Funderz.net and operate it through a series of alter egos and assumed names, including Empire Capital, Hop Capital, and Region Capital.

46.      According to the New York Department of State website, Funderz.net operates or has operated under no fewer than 18 assumed business names.

47.     Like the Yellowstone Defendants, the Funderz Defendants utilize a network of sales officers and brokers to sell usurious loans to small businesses in need of cash advances to operate. Brokers are rewarded with a commission based upon a percentage of income generated for the Funderz Defendants.

48.     Although purported to be the purchase and sale of future receivables, the Funderz MCA agreements are loans charging interest rates in violation of New York usury laws, as explained more fully below.

49.     Brokers and sales officers affiliated with the Funderz Defendants regularly refer to the agreements as "loans." Among other things, they represent to small business owners that these "loans" are merely "bridge loans" to provide liquidity while the broker works to secure longer-term financing at lower interest rates.

50.     In reality, however, there never is any plan to secure long-term, low-interest rates or create long-term success for the small businesses. Instead, the goal is to keep the businesses surviving, albeit barely, by trapping it in a cycle of high-interest, short-term loans. As the cycle continues, more and more of the proceeds of the new loans are used to pay off prior loan balances. This allows the Funderz Defendants to extract as much money as possible in interest and fees before the business finally collapses.

51.     At that point, the Funderz Defendants file confessions of judgment against the individual guarantors on the loans and continue to pursue collection from the business owners.

**D.    ITG's Relationship with Zoom and Defendants.**

52.     ITG is the third largest manufacturer of tobacco products in the United States.

53.     Zoom was a brand marketing and research firm with a principal place of business in Forsyth County, North Carolina. Zoom provided brand marketing services to its clients and also sourced and engaged other third parties to provide brand marketing to its clients through subcontracts and related agreements.

54.     In 2018, ITG entered into multiple contracts with Zoom (collectively, the "Marketing Contracts"), whereby Zoom was required either to provide marketing and other

market-related services to ITG or to procure marketing and other market-related services for ITG through the engagement of third-party subcontractors (the "Marketing Services").

55.    ITG advanced millions of dollars to Zoom for these Marketing Services. Some of the funds were payments of Zoom's fees. However, the vast majority of the funds were pre-payments only to be used by Zoom to pay for Marketing Services (the "ITG Funds"). Because ITG was advancing costs for future events, even though Zoom received large influxes of cash, Zoom's actual profit margin was only approximately 7%.

56.    During the course of performance of the Marketing Contracts, Zoom and its CEO Mr. Matthews misused ITG Funds, failed to perform its obligations, failed to pay the contractors it procured to perform the Marketing Services, and breached the Marketing Contracts.

57.    On August 16, 2019, ITG sued Zoom to recover its damages for breach of the Marketing Contracts in an action captioned *ITG Brands, LLC v. Zoom Insights, Inc.*, Superior Court of Justice, Guilford County, Case No. 19 CVS 7932 (the "Zoom Litigation"). Ultimately, ITG obtained a consent judgment against Zoom for $3.3 million, with interest accruing at the legal rate.

58.    During the course of discovery in the Zoom Litigation, ITG gained access to Zoom's bank records and other relevant financial information.

59.    As ITG discovered, Zoom was heavily leveraged during the course of its dealings with ITG. After debt service, Zoom's cash flow was thin to non-existent.

60.    In an effort to continue operations and meet its obligations under the Marketing Contracts with ITG, Zoom began seeking additional financing to help with its liquidity issues. Zoom first sought out legitimate financial institutions and factoring companies. However, after performing due diligence and assessing Zoom's finances, cash flow balances, and outstanding

obligations to ITG, all of the legitimate financial institutions and factoring companies declined to offer Zoom financing. These legitimate institutions and companies recognized that the funds advanced to Zoom by ITG were held for the benefit of ITG and to be used exclusively in providing the Marketing Services. Accordingly, these institutions and companies knew or had constructive notice that they would not have access to or ownership of the ITG Funds or be able to withdraw them as part of a factoring agreement because the funds always remained subject to ITG's claims until Zoom actually provided the services it promised to ITG.

61.     Desperate, Zoom turned to the loan sharks, specifically Yellowstone and Funderz.net.

62.     Between January 19, 2017, and January 7, 2019, Zoom entered into at least six Secured Merchant Agreements with the Yellowstone Entities, specifically through Yellowstone and World Global d/b/a Grand Capital Funding (the "Yellowstone Agreements").

63.     Additionally, between December 18, 2018, and March 19, 2019, Zoom entered into at least three Secured Merchant Agreements with Funderz.net, specifically through its alter egos Hop Capital and Region Capital (the "Funderz Agreements").

64.     However, these agreements did not restore Zoom's balance sheet. Instead, these agreements forced Zoom into a debt-spiral, eventually causing Zoom to collapse in 2019. At the time Zoom collapsed, it owed millions of dollars to its creditors, the vast majority of which was owed to ITG.

65.     Zoom became insolvent and unable to continue operations due to the high cost of borrowing under the Yellowstone and Funderz Agreements. Despite receiving more than $24 million in advanced funds from ITG, the unconscionable repayment terms and usurious interest rates charged under the Yellowstone and Funderz Agreements made it impossible for Zoom to

operate and fulfill its obligations. With each Secured Merchant Agreement, Zoom's financial position deteriorated—further harming its efforts to perform its obligations to ITG.

66.    Further, while bleeding Zoom dry and extracting millions of dollars from its accounts, Yellowstone, World Global, and Funderz.net siphoned off through their daily draws millions of dollars in ITG Funds that had been advanced by ITG.

67.    ITG received no benefit from Zoom entering into the Yellowstone and Funderz Agreements. Indeed, ITG's harm is directly traceable to the Yellowstone and Funderz Agreements and the debt spiral they created for Zoom.

68.    After learning of Zoom's debt spiral due to the actions of the Yellowstone Defendants and Funderz Defendants, Zoom filed suit in North Carolina state court in a case captioned *ITG Brands, LLC v. Funders Link, LLC; Funderz.net, LLC; DC Fund, LLC; and World Global Capital, LLC*, Superior Court of Justice, Guilford County, Case No. 20 CVS 7312 (the "Funders Litigation").

69.    ITG brought claims of Tortious Interference with Contract, Conversion/Possession of Stolen Funds, Voidable Transfer, Unfair and Deceptive Trade Practices,  and Constructive Trust against both World Global and Funderz.net.

70.    On April 6, 2023, pursuant to N.C. Gen. Stat. §§ 1-339.1(a) and 1-339.4, the court in the Zoom Litigation granted ITG's motion for the appointment of a commissioner to sell all potential claims possessed by Zoom against Defendants in order to generate funds with which to pay the consent judgment. In its Order, the court found that these claims had potential value that could be used to pay off Zoom's judgment debts; however, Zoom had no resources with which to pursue these claims. Further, the court specifically concluded that the sale of Zoom's claims did

not violate any North Carolina public policy. A true and accurate copy of the court's Order is attached as Exhibit A.

71.     On May 12, 2023, pursuant to a court-ordered sale, ITG purchased Zoom's potential claims at a judicial sale held in Guilford County, North Carolina, including Zoom's potential claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* A true and accurate copy of the filed Report of Public Sale is attached as Exhibit B. Having purchased Zoom's claims at the judicial sale, ITG is the successor in interest to Zoom's claims against Defendants. Accordingly, ITG has dismissed the Funders Litigation without prejudice and filed the present action, bringing claims against all Defendants under RICO on behalf of Zoom, as well as on its own behalf, owing to the direct harm it has sustained as a result of Defendants' illicit activities. ITG further brings declaratory judgment claims arising out of the Secured Merchant Agreements Defendants executed with Zoom.

## THE UNDERLYING TRANSACTIONS

### A.     The Yellowstone Agreements.

72.     Between June 19, 2017, and August 3, 2018, Zoom entered into at least three Secured Merchant Agreements with Yellowstone pursuant to which Yellowstone advanced Zoom $148,981 in actual cash but collected $337,570 due to the usurious interest rates charged.

#### i.     The June 19, 2017 Agreement

73.     On June 19, 2017, Yellowstone and Zoom entered into an agreement, a true and accurate copy of which is attached as Exhibit C (the "June 19, 2017 Agreement"). Under its terms, Yellowstone agreed to advance to Zoom a stated "Purchase Price" of $50,000, in exchange for the purported purchase of a "Specified Percentage" of Zoom's future receipts, until such time as Zoom repaid Yellowstone the "Purchased Amount" of $74,950.

74.     The June 19, 2017 Agreement provided that the "Specified Percentage" initially was set at twenty percent (20%) of Zoom's receipts, but should there be any violation of the Terms and Conditions or an Event of Default, the Specified Percentage immediately would become 100%, such that Yellowstone purportedly would be entitled to every penny that hit Zoom's bank accounts.

75.     Pursuant to Section 1.8 of the June 19, 2017 Agreement, the Purchase Price purportedly was based on the current fair market value of the Specified Percentage of Zoom's future receivables, and payments to Yellowstone were to be conditioned upon Zoom's sale of products and services and the payment therefor.

76.     However, the June 19, 2017 Agreement contained an addendum, whereby the Specified Percentage of 20% was revised to be $995 per business day, to be taken in the form of daily ACH withdrawals. Per the terms of the addendum, "Should any of the terms of this Addendum conflict with the terms of the agreement . . . then the terms of this Addendum shall govern and be controlling." The Addendum described the $995 daily withdrawal amount as a "good-faith approximation of the Specified Percentage, based on [Zoom's] receipts."

77.     Thus, in reality, the agreement was a loan of $50,000 that required repayment of $74,950 in just 75 business days. This translated into an annual interest rate of over 300%. On its face, the loan contained an interest rate over 12 times greater than the 25% permitted under New York law.

78.     Upon information and belief, Yellowstone's and the Yellowstone Defendants' intent in executing the June 19, 2017 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of Zoom's receivables and bear the risk associated with Zoom's collection

of those receivables. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of Zoom's receivables.

79.     Additionally, Yellowstone did not advance the full $50,000, and instead only advanced $45,000 after deducting Origination Fees, ACH Program Fees, Bank Fees, and a Professional Services Fee of $2,500 paid to the broker.

80.     Although these fees purportedly were related to the costs of due diligence and withdrawing the daily ACH payments, the actual costs of the ACH withdrawals and due diligence were a fraction of the fees charged. Instead, these fees were merely additional disguised interest.

81.     Taking into account this additional disguised interest, the June 19, 2017 Agreement had an effective annual interest rate of 482%, over 19 times greater than the 25% allowed under New York law.

82.     By revising the Specified Percentage of Zoom's receivables to a fixed amount of $995 per business day, the June 19, 2017 Agreement no longer was conditioned upon Zoom's sale of products and services but instead was a loan with guaranteed repayment to Yellowstone. Although the June 19, 2017 Agreement purported to give Zoom the option to request a reconciliation to ensure the amount remitted equaled the Specified Percentage, the Addendum stated that any potential reconciliation was provided "as a courtesy" and that Yellowstone was "under no obligation to provide same."

83.     The June 19, 2017 Agreement also required Zoom to grant Yellowstone a security interest in all assets owned or hereinafter acquired, and required Zoom owner Tim Matthews to personally guarantee Zoom's performance under the agreement. Additionally, Mr. Matthews was

required to sign a Confession of Judgment for the full amount of the June 19, 2017 Agreement, plus interest and attorneys' fees.

### ii.  The July 17, 2017 Agreement

84.     Less than one month later, on July 17, 2017, Zoom entered into another Secured Merchant Agreement with Yellowstone, a true and accurate copy of which is attached as Exhibit D (the "July 17, 2017 Agreement"). Under its terms, Yellowstone agreed to advance to Zoom a stated "Purchase Price" of $100,000, in exchange for the purported purchase of a "Specified Percentage" of Zoom's future receipts, until such time as Zoom repaid the "Purchased Amount" of $145,900.

85.     The July 17, 2017 Agreement provided that the "Specified Percentage" initially was set at twenty percent (20%) of Zoom's receipts, but should there be any violation of the Terms and Conditions or an Event of Default, the Specified Percentage immediately would become 100%, such that Yellowstone purportedly would be entitled to every penny that hit Zoom's bank accounts.

86.     Once again, an addendum to the July 17, 2017 Agreement replaced the Specified Percentage of 20% with a daily ACH withdrawal amount, this time $1,795. The July 17, 2017 Agreement again described the daily withdrawal amount as a "good-faith approximation of the Specified Percentage, based on [Zoom's] receipts." In other words, even though less than one month had transpired, and Zoom's financial position had only deteriorated, the July 17, 2017 Agreement estimated that Zoom's daily receivables had doubled, such that 20% of its daily receivables now approximated $1,795 instead of $995. This simple fact belied Yellowstone's "good-faith approximation" and the illusory nature of the transaction as a purchase of receivables.

87.     Reflecting economic reality and the Yellowstone Defendants' true intent, the July 17, 2017 Agreement constituted a loan of $100,000 that required repayment of $145,900 in just 81

business days, resulting in an effective annual interest rate of 235%. Thus, on its face, the loan contained an interest rate over nine times greater than the 25% allowed under New York law.

88.     However, Yellowstone did not advance Zoom the full $100,000 Purchase Price. Instead, Zoom only received $31,976. After deducting Origination Fees, ACH Program Fees, Bank Fees, a Risk Assessment Fee, and a UCC Fee, the rest of the proceeds of the new Agreement were used to pay off the balance of June 19, 2017 Agreement.

89.     Although these fees purportedly were related to the costs of due diligence and withdrawing the daily ACH payments, the actual costs of the ACH withdrawals and due diligence were a fraction of the fees charged. Instead, these fees were merely additional disguised interest.

90.     Taking into account the dramatically reduced amount advanced based on fees and monies used to pay off the prior loan, the July 17, 2017 Agreement had a staggering effective annual interest rate of 12,745%, more than 500 times the maximum 25% permitted under New York law.

91.     Upon information and belief, Yellowstone's and the Yellowstone Defendants' intent in executing the July 17, 2017 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of Zoom's receivables and bear the risk associated with Zoom's collection of those receivables. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of Zoom's receivables.

92.     By revising the Specified Percentage of Zoom's receivables to a fixed amount of $1,795 per business day, the July 17, 2017 Agreement was no longer conditioned upon Zoom's sale of products and services but instead was a loan with guaranteed repayment to Yellowstone.

Although the July 17, 2017 Agreement purported to give Zoom the option to request a reconciliation to ensure the amount remitted equaled the Specified Percentage, the Addendum stated that any potential reconciliation was provided "as a courtesy" and that Yellowstone was "under no obligation to provide same."

93.     The July 17, 2017 Agreement also required Zoom to grant Yellowstone a security interest in all assets owned or hereinafter acquired, and required Mr. Matthews to personally guarantee Zoom's performance under the agreement. Additionally, Mr. Matthews was required to sign a Confession of Judgment for the full amount of the July 17, 2017 Agreement, plus interest and attorneys' fees.

### iii.     The December 5, 2017 Agreement

94.     On December 5, 2017, Zoom entered into another Secured Merchant Agreement with Yellowstone, a true and accurate copy of which is attached as Exhibit E (the "December 5, 2017 Agreement"). Under its terms, Yellowstone agreed to advance to Zoom a stated "Purchase Price" of $80,000, in exchange for the purported purchase of a "Specified Percentage" of Zoom's future receipts, until such time as Zoom repaid Yellowstone the "Purchased Amount" of $116,720.

95.     The December 5, 2017 Agreement provided that the "Specified Percentage" initially was set at twenty percent (20%) of Zoom's receipts, but should there be any violation of the Terms and Conditions or an Event of Default, the Specified Percentage immediately would become 100%, such that Yellowstone purportedly would be entitled to every penny that hit Zoom's bank accounts.

96.     Once again, an addendum to the December 5, 2017 Agreement replaced the Specified Percentage of 20% with a daily ACH withdrawal amount, this time $1,595. The December 5, 2017 Agreement again described the daily withdrawal amount as a "good-faith approximation of the Specified Percentage, based on [Zoom's] receipts."

97.     As a matter of economic reality and simple mathematics, the December 5, 2017 Agreement constituted a loan of $80,000 that required repayment of $116,720 in just 73 business days, resulting in an effective annual interest rate of 283%, more than 11 times greater than the 25% allowed by New York law.

98.     However, Yellowstone did not advance Zoom the full $80,000 Purchase Price. Instead, Zoom only received $72,005. After deducting Origination Fees, ACH Program Fees, Bank Fees, a Risk Assessment Fee, and a UCC Fee, the rest of the proceeds of the new Agreement were used to pay off the balance of July 17, 2017 Agreement.

99.     Although these fees purportedly were related to the costs of due diligence and withdrawing the daily ACH payments, the actual costs of the ACH withdrawals and due diligence were a fraction of the fees charged. Instead, these fees were merely additional disguised interest.

100.    Taking into account this additional disguised interest, the December 5, 2017 Agreement had an effective annual interest rate of 456%, more than 18 times higher than the 25% allowed under New York law.

101.    Upon information and belief, Yellowstone's and the Yellowstone Defendants' intent in executing the December 5, 2017 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of Zoom's receivables and bear the risk associated with Zoom's collection of those receivables. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of Zoom's receivables.

102.    By revising the Specified Percentage of Zoom's receivables to a fixed amount of $1,595 per business day, the December 5, 2017 Agreement no longer was conditioned upon

Zoom's sale of products and services but instead was a loan with guaranteed repayment to Yellowstone. Although the December 5, 2017 Agreement purported to give Zoom the option to request a reconciliation to ensure the amount remitted equaled the Specified Percentage, the Addendum stated that any potential reconciliation was provided "as a courtesy" and that Yellowstone in its sole discretion would determine if the appropriate evidence and documentation had been submitted to identify the appropriate amount of the Specified Percentage.

103.    The December 5, 2017 Agreement also required Zoom to grant Yellowstone a security interest in all assets owned or hereinafter acquired, and required Mr. Matthews to personally guarantee Zoom's performance under the agreement. Additionally, Mr. Matthews was required to sign a Confession of Judgment for the full amount of the December 5, 2017 Agreement, plus interest and attorneys' fees

**B.    The World Global Agreements.**

104.    Between August 3, 2018 and January 7, 2019, Zoom entered into at least three Secured Merchant Agreements with Yellowstone Defendant World Global d/b/a Grand Capital Funding, pursuant to which World Global advanced Zoom only $547,588 in actual cash but collected approximately $950,000 due to the usurious interest rates charged.

**i.    The August 3, 2018 Agreement**

105.    On August 3, 2018, Zoom entered into a Secured Merchant Agreement with World Capital a true and accurate copy of which is attached as Exhibit F (the "August 3, 2018 Agreement"). The terms and font of the agreement are identical to the Yellowstone December 5, 2017 Agreement. Under its terms, World Global agreed to advance to Zoom a stated "Purchase Price" of $160,000, in exchange for the purported purchase of a "Specified Percentage" of Zoom's future receipts until such time as Zoom repaid World Global the "Purchased Amount" of $239,840.

106.    The August 3, 2018 Agreement provided that the "Specified Percentage" initially was set at twenty percent (20%) of Zoom's receipts, but should there be any violation of the Terms and Conditions or an Event of Default, the Specified Percentage immediately would become 100%, such that World Global purportedly would be entitled to every penny that hit Zoom's bank accounts.

107.    Once again, an addendum to the August 3. 2018 Agreement replaced the Specified Percentage of 20% with a daily ACH withdrawal amount, this time $2,284, which the addendum described as a "good-faith approximation of the Specified Percentage, based on [Zoom's] receipts."

108.    As a matter of economic reality and simple mathematics, the August 3, 2018 Agreement constituted a loan of $160,000 that required repayment of $239,840 in 105 business days, resulting in an effective annual interest rate of 172%, more than six times greater than the 25% allowed by New York law.

109.    However, World Global did not advance Zoom the full $160,000 Purchase Price, and instead only advanced $145,001 after deducting Origination Fees, ACH Program Fees, Bank Fees, a Risk Assessment Fee, and a UCC Fee. Although these fees purportedly were related to the costs of due diligence and withdrawing the daily ACH payments, the actual costs of the ACH withdrawals and due diligence were a fraction of the fees charged. Instead, these fees were merely additional disguised interest.

110.    Taking into account this additional disguised interest, the August 3, 2018 Agreement had an effective annual interest rate of 248%, nearly 10 times higher than the 25% allowed under New York law.

111.    Upon information and belief, World Global's and the Yellowstone Defendants' intent in executing the August 8, 2018 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of Zoom's receivables and bear the risk associated with Zoom's collection of those receivables. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of Zoom's receivables.

112.    By revising the Specified Percentage of Zoom's receivables to a fixed amount of $2,284 per business day, the August 3, 2018 Agreement was no longer conditioned upon Zoom's sale of products and services but instead was a loan with guaranteed repayment to World Global. Although the August 3, 2018 Agreement purported to give Zoom the option to request a reconciliation to ensure the amount remitted equaled the Specified Percentage, the Addendum stated that any potential reconciliation was provided "as a courtesy" and that World Global in its sole discretion would determine if the appropriate evidence and documentation had been submitted to identify the appropriate amount of the Specified Percentage.

113.    The August 3, 2018 Agreement also required Zoom to grant World Global a security interest in all assets owned or hereinafter acquired, and required Mr. Matthews to personally guarantee Zoom's performance under the agreement. Additionally, Mr. Matthews was required to sign a Confession of Judgment for the full amount of the August 3, 2018 Agreement, plus interest and attorneys' fees.

### ii.    The September 28, 2018 Agreement

114.    On September 28, 2018, Zoom entered into another Secured Merchant Agreement with World Global, a true and accurate copy of which is attached as Exhibit G (the "September 28, 2018 Agreement"). Under its terms, World Global agreed to advance to Zoom a stated

"Purchase Price" of $370,000, in exchange for the purported purchase of a "Specified Percentage" of Zoom's future receipts until such time as Zoom repaid World Global the "Purchased Amount" of $554,630.

115.    The September 28, 2018 Agreement provided that the "Specified Percentage" initially was set at twenty-five percent (25%) of Zoom's receipts, but should there be any violation of the Terms and Conditions or an Event of Default, the Specified Percentage immediately would become 100%, such that Yellowstone purportedly would be entitled to every penny that hit Zoom's bank accounts.

116.    Once again, an addendum to the September 28, 2018 Agreement replaced the Specified Percentage of 25% with a daily ACH withdrawal amount, this time $4,769, which the addendum described as a "good-faith approximation of the Specified Percentage, based on [Zoom's] receipts."

117.    As a matter of economic reality and simple mathematics, the September 28, 2018 Agreement constituted a loan of $370,000 that required repayment of $554,630 within 116 business days, resulting in an effective annual interest rate of 147%, nearly six times that allowed by New York law.

118.    However, World Global did not advance Zoom the full $370,000 Purchase Price. Instead, Zoom only received $184,200. After deductions for Origination Fees, ACH Program Fees, Bank Fees, a Risk Assessment Fee, and a UCC Fee, the rest of the proceeds of the new Agreement were used to pay off the balance of August 3, 2018 Agreement.

119.    Although these fees were purportedly related to the costs of due diligence and withdrawing the daily ACH payments, the actual costs of the ACH withdrawals and due diligence were a fraction of the fees charged. Instead, these fees were merely additional disguised interest.

120.    Taking into account this additional disguised interest, the September 28, 2018 Agreement had an effective annual interest rate of 1,075%, 43 times higher than the 25% allowed under New York law.

121.    Upon information and belief, World Global's and the Yellowstone Defendants' intent in executing the September 28, 2018 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of Zoom's receivables and bear the risk associated with Zoom's collection of those receivables. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of Zoom's receivables.

122.    By revising the Specified Percentage of Zoom's receivables to a fixed amount of $4,769 per business day, the September 28, 2018 Agreement was no longer conditioned upon Zoom's sale of products and services but instead was a loan with guaranteed repayment to World Global.

123.    The September 28, 2018 Agreement also required Zoom to grant World Global a security interest in all assets owned or hereinafter acquired, and required Mr. Matthews to personally guarantee Zoom's performance under the agreement. Additionally, Mr. Matthews was required to sign a Confession of Judgment for the full amount of the August 8, 2018 Agreement, plus interest and attorneys' fees.

### iii.    The January 7, 2019 Agreement

124.    On January 7, 2019, Zoom entered into an additional Secured Merchant Agreement with World Global, a true and accurate copy of which is attached as Exhibit H (the "January 7, 2019 Agreement"). Under its terms, World Global agreed to advance to Zoom a stated "Purchase

Price" of $500,000, in exchange for the purported purchase of a "Specified Percentage" of Zoom's future receipts until such time as Zoom repaid World Global the "Purchased Amount" of $749,500.

125.    The January 7, 2019 Agreement provided that the "Specified Percentage" was set at twenty-five percent (25%) of Zoom's receipts.

126.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of 7,889, which the Agreement described as a "good faith approximation of the Specified Percentage of [Zoom] Daily Future Receipts."

127.    As a matter of economic reality and simple mathematics, the January 7, 2019 Agreement constituted a loan of $500,000 that required repayment of $749,500 within 95 business days, which translates into an effective annual interest rate of more than 200%, over eight times greater than the 25% allowed by New York law.

128.    However, World Global did not advance Zoom the full $500,000 Purchase Price. Instead, Zoom only received $218,387. In addition to an Origination Fee of $38,850, a Due Diligence Fee of $50,000, an ACH Program Fee, a Bank Fee, a UCC Fee, and a Wire Fee, the rest of the proceeds of the new Agreement were used to pay off the balance of September 28, 2018 Agreement.

129.    Although these fees were purportedly related to the costs of origination, due diligence, and withdrawing the daily ACH payments, the actual costs of the origination, due diligence, and ACH withdrawals were a fraction of the fees charged. Instead, these fees were merely additional disguised interest.

130.    Taking into account this additional disguised interest, the January 7, 2019 Agreement had an effective annual interest rate of 2,822%, over 112 times higher than the 25% allowed under New York law.

131.    Upon information and belief, World Global's and the Yellowstone Defendants' intent in executing the January 7, 2019 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of Zoom's receivables and bear the risk associated with Zoom's collection of those receivables. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of Zoom's receivables.

132.    The January 7, 2019 Agreement also required Zoom to grant World Global a security interest in all assets owned or hereinafter acquired, and required Mr. Matthews to personally guarantee Zoom's performance under the agreement. Additionally, Mr. Matthews was required to sign a Confession of Judgment for the full amount of the August 8, 2018 Agreement, plus interest and attorneys' fees.

### C.    The Funderz Agreements.

133.    Between December 18, 2018 and March 19, 2019, Zoom entered into at least three Secured Merchant Agreements with Funderz.net alter egos Hop Capital and Region Capital, pursuant to which Hop Capital advanced Zoom approximately $1.75 million and Region Capital advanced Zoom approximately $350,000. By July 2019, when Zoom collapsed, Funderz.net had already collected approximately $1.8 million on these loans—nearly a full return of its capital. Nevertheless, due to the staggering interest rates charged, Funderz.net continued to insist that Zoom owed it an additional $1.9 million.

i.     **The December 12, 2018 Agreement**

134.   On December 12, 2018, Zoom entered into a Secured Merchant Agreement with Hop Capital, a true and accurate copy of which is attached as Exhibit I (the "December 12, 2018 Agreement").[6]

135.   Under the December 12, 2018 Agreement, Hop Capital agreed to advance to Zoom a "Purchase Price" of $1,000,000, in exchange for the purported purchase of a "Specified Percentage" of Zoom's future receipts until such time as Zoom repaid Hop Capital the "Purchased Amount" of $1,430,000.

136.   The December 12, 2018 Agreement provided that the "Specified Percentage" was set at ten percent (10%) of Zoom's receipts, but should there be any Event of Default, the Specified Percentage immediately would become 100%, such that Hop Capital purportedly would be entitled to every penny that hit Zoom's bank accounts.

137.   The Purchased Amount was to be repaid through weekly ACH withdrawals in the amount of $71,500, such that the Purchased Amount would be repaid within 20 weeks, which email records from Hop Capital and Funderz.net email addresses refer to as the "term" of the transaction. Reflecting economic reality and the Funderz Defendants' true intent, the December 12, 2018 Agreement constituted a loan of $1 million that required repayment of $1.43 million in 20 weeks, resulting in an effective annual interest rate of more than 150%, over six times greater than the 25% allowed by New York law.

138.   However, Hop Capital did not advance Zoom the full $1,000,000 Purchase Price. Instead, Zoom only received $900,000, with the rest going to commissions and other fees.

---

[6] At this time, ITG only possesses an incomplete copy of the December 12, 2018 Agreement that was attached to a demand letter sent by the law offices of Regents and Associates on behalf of Hop Capital.

139.   Although these fees purportedly were related to the costs of due diligence and withdrawing the daily ACH payments, the actual costs of the ACH withdrawals and due diligence were a fraction of the fees charged. Instead, these fees were merely additional disguised interest.

140.   Taking into account this additional disguised interest, the December 12, 2018 Agreement had an effective annual interest rate of 233%, over eight times higher than the 25% allowed under New York law

141.   Upon information and belief, Hop Capital's and the Funderz Defendants' intent in executing the December 12, 2018 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of Zoom's receivables and bear the risk associated with Zoom's collection of those receivables. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of Zoom's receivables.

### ii.   The February 19, 2019 Agreement

142.   On February 19, 2019, Zoom entered into another Secured Merchant Agreement with Hop Capital, a true and accurate copy of which is attached as Exhibit J (the "February 19, 2019 Agreement"). Under its terms, Hop Capital agreed to advance to Zoom a "Purchase Price" of $1,715,000, in exchange for the purported purchase of a "Specified Percentage"—ten percent (10%)—of Zoom's future receipts until such time as Zoom repaid Hop Capital the "Purchased Amount" of $2,401,000.

143.   The February 19, 2019 Agreement provided that the "Specified Percentage" initially was set at ten percent (10%) of Zoom's receipts, but should there be any Event of Default, the Specified Percentage immediately would become 100%, such that Hop Capital purportedly would be entitled to every penny that hit Zoom's bank accounts.

144.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $17,000, which the February 19, 2019 Agreement described as a "good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month." Belying the characterization of the daily withdrawal amount as a good faith estimate of the Specified Percentage of receipts, amended to the February 19, 2019 Agreement was an ACH Debit Authorization Agreement that specified Hop Capital would withdraw the precise amount of $17,000.00 daily and *not* withdraw a "Percentage of each Banking Deposit."

145.    Reflecting economic reality and the Funderz' Defendants' true intent, the February 19, 2019 Agreement constituted a loan of $1,715,000 that required repayment of $2,401,000 within 141 business days, which email records from Hop Capital and Funderz.net email addresses refer to as the "term" of the transaction. Thus, on its face, the February 19, 2019 Agreement was in fact a loan with an effective annual interest rate of more than 86%, over three times more than the 25% allowed by New York law.

146.    However, Hop Capital did not advance Zoom the full $1,715,000 Purchase Price. Instead, Zoom only received $852,651. After deductions for Origination Fees, ACH Program Fees, Bank Fees, and a UCC Fee, Hop Capital applied the rest of the proceeds of the new Agreement to pay off the $715,000 balance of the December 18, 2018 Agreement.

147.    Although these fees purportedly were related to the costs of underwriting and withdrawing the daily ACH payments, the actual costs of underwriting and ACH withdrawals were a fraction of the fees charged. Instead, these fees were merely additional disguised interest.

148.    Taking into account the dramatically reduced amount advanced based on fees and monies used to pay off the prior loan, the February 19, 2019 Agreement had an effective annual interest rate of 573%, over 22 times higher than the 25% allowed under New York law.

149.    Upon information and belief, Hop Capital's and the Funderz Defendants' intent in executing the February 19, 2019 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of Zoom's receivables and bear the risk associated with Zoom's collection of those receivables. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of Zoom's receivables.

150.    The February 19, 2019 Agreement also required Zoom to grant Funderz.net a security interest in all assets owned or hereinafter acquired, and required Mr. Matthews to personally guarantee Zoom's performance under the agreement. Additionally, Mr. Matthews was required to sign a Confession of Judgment for the full amount of the February 19, 2019 Agreement, plus interest and attorneys' fees.

151.    Additionally, Section 1.10 of the February 19, 2019 Agreement purported to require Zoom to waive the defense of usury in any proceeding seeking repayment of the full "Purchased Amount."

### iii.    The March 19, 2019 Agreement

152.    One month later, on March 19, 2019, Zoom entered into a Secured Merchant Agreement with another Funderz.net alter ego, Region Capital, a true and accurate copy of which is attached as Exhibit K (the "March 19, 2019 Agreement"). Under its terms, Region Capital agreed to advance to Zoom a "Purchase Price" of $400,000, in exchange for the purported purchase of a

"Specified Percentage" of Zoom's future receipts, until such time as Zoom repaid Region Capital the "Purchased Amount" of $640,000.

153.    The March 19, 2019 Agreement provided that the "Specified Percentage" initially was set at ten percent (10%) of Zoom's receipts, but should there be any Event of Default, the Specified Percentage immediately would become 100%, such that Region Capital purportedly would be entitled to every penny that hit Zoom's bank accounts.

154.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $21,333, which the March 19, 2019 Agreement described as a "good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month." Belying the characterization of the daily withdrawal amount as a good faith estimate of the Specified Percentage of receipts, amended to the March 19, 2019 Agreement was an ACH Debit Authorization Agreement that specified Region Capital would withdraw the precise amount of $21,333.00 daily and *not* withdraw a "Percentage of each Banking Deposit."

155.    Reflecting economic reality and the Funderz' Defendants' true intent, the March 19, 2019 Agreement constituted a loan of $400,000 that required repayment of $640,000 within just 30 business days, which email records from Hop Capital and Funderz.net email addresses refer to as the "term" of the transaction. Thus, on its face, the March 19, 2019 Agreement was in fact a loan with an astounding annual interest rate of 5,775%, 231 times more than the 25% allowed by New York law.

156.    However, Region Capital did not advance Zoom the full $400,000 Purchase Price. Instead, Zoom only received $349,801, due to Origination, ACH Program, Bank, and UCC Fees. Although these fees were purportedly related to the costs of underwriting and withdrawing the

daily ACH payments, the actual costs of underwriting, diligence, and the ACH withdrawals were a fraction of the fees charged. Instead, these fees were merely additional disguised interest.

157.    Taking into account this additional disguised interest, the March 19, 2019 Agreement had an effective annual interest rate of a staggering 18,682%, over 747 times higher than the 25% allowed under New York law.

158.    Upon information and belief, Region Capital's and the Funderz Defendants' intent in executing the March 19, 2019 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of Zoom's receivables and bear the risk associated with Zoom's collection of those receivables. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of Zoom's receivables.

159.    The March 19, 2019 Agreement also required Zoom to grant Region Capital a security interest in all assets owned or hereinafter acquired, and required Mr. Matthews to personally guarantee Zoom's performance under the agreement. Additionally, Mr. Matthews was required to sign a Confession of Judgment for the full amount of the March 19, 2019 Agreement, plus interest and attorneys' fees.

160.    Additionally, Section 1.10 of the March 19, 2019 Agreement purported to require Zoom to waive the defense of usury in any proceeding seeking repayment of the full "Purchased Amount."

**D.      Defendants Disguised the True Nature of their Usurious Loans by Cloaking the Agreements in the Pretense of Purchases of Future Receipts.**

**i.      Defendants Prepared Agreements that Purported to Operate as a Purchase of Receipts.**

161.      The Yellowstone and Funderz Defendants cloaked their usurious loans in contracts purporting to provide for the purchase of future receipts.

162.      The Defendants styled the Agreements as a "Purchase and Sale of Future Receivables" or "Future Receivables Sale and Purchase Agreement."

163.      The Agreements purportedly required Zoom to sell, assign, and transfer to Yellowstone, World Global, or Funderz, as applicable, a "Specified Percentage" of Zoom's "future accounts, contract rights, and other obligations arising from or relating to the payment of monies from merchant's customer' and/or other third party payors (the 'Receipt's')."[7]

164.      In an effort to conceal the Agreements' true economic nature and avoid state usury laws, the Defendants purported to disclaim any collection of interest.

a.      The Yellowstone Agreements, World Global Agreements, and Funderz Agreements all provided that "Merchant and [YCL/GCF/HC/RC] agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from [YCL/GCF/HC/RC] to Merchant."[8]

---

[7] This language was identical in each of the Yellowstone Agreements, World Global Agreements, and Funderz Agreements, except insofar as (i) the Funderz Agreements used the word "entitlements" instead of "obligations," and the January 7, 2019 Agreement defined future receipts to mean "all of Seller's receipts for monies for the sale of its goods and services."

[8] See Exs. C–G Section 1.8; I–K Section 1.10 [June 19, 2017 Agreement; July 17, 2017 Agreement; December 5, 2017 Agreement; August 3, 2018 Agreement; September 28, 2018 Agreement; December 12, 2018 Agreement; February 19, 2019 Agreement; March 19, 2019 Agreement.] The only Agreement with slightly different terms was the January 7, 2019 Agreement, Ex. H, which likewise provided, in a section titled "Not a Loan," that "Seller and GCF agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by GCF is not intended to be, nor shall it

      b.      The Yellowstone and World Global Agreements also provided:

> In no event shall the aggregate of all amounts be deemed as interest
> hereunder and charged or collected hereunder exceed the highest rate
> permissible at law. In the event that a court determines that [YCL/GCF]
> has charged or received interest hereunder in excess of the highest rate
> allowable by law, then the rate in effect hereunder shall automatically
> be reduced to the maximum rate permitted by applicable law and
> [YCL/GCF] shall promptly refund to Merchant any interest received by
> [YCL/GCF] in excess of the maximum lawful rate, it being intended
> that Merchant not pay or contract to pay, and that [YCL/GCF] not
> receive or contract to receive, directly or indirectly in any manner
> whatsoever, interest in excess of that which may be paid by Merchant
> under applicable law.[9]

      c.      The Funderz Agreements contained similar language and went one step
further; they purported to force Zoom to waive any defense of usury:

> In no event shall the aggregate of all amounts or any portion thereof be
> deemed as interest hereunder, and in the event it is found to be interest
> despite the parties hereto specifically representing that it is NOT
> interest, it shall be found that no sum charged or collected hereunder
> shall exceed the highest rate permissible at law. In the event that a court
> nonetheless determines that HC has charged or received interest
> hereunder in excess of the highest applicable rate, the rate in effect
> hereunder shall automatically be reduced to the maximum rate
> permitted by applicable law and HC shall promptly refund to Merchant
> any interest received by HC in excess of the maximum lawful rate, it
> being intended that Merchant not pay or contract to pay, and that HC
> not receive or contract to receive, directly or indirectly in any manner
> whatsoever, interest in excess of that which may be paid by Merchant
> under applicable law. As a result thereof, Merchant knowingly and
> willingly waives the defense of Usury in any action or proceeding.[10]

---

be construed as, a loan from GCF to Seller that requires absolute and unconditional repayment on
a maturity date."
[9] See Exs. C–G Section 1.8 [June 19, 2017 Agreement; July 17, 2017 Agreement; December 5,
2017 Agreement; August 3, 2018 Agreement; September 28, 2018 Agreement.] The January 9,
2019 Agreement provided that "If . . . a court having jurisdiction over this Agreement and the
parties hereto shall have determined that GCF has charged or received interest hereunder in excess
of the highest rate allowed by law, then the rate of such interest received by GCF shall
automatically be reduced to the maximum rate permitted by applicable law and GCF shall
promptly refund to Seller any interest received by GCF in excess of the maximum lawful rate."
[10] See Exs. J–K Section 1.10 [February 19, 2019 Agreement; March 19, 2019 Agreement].

       **ii.**     **Consistent with Defendants' True Intent and Economic Reality, the Agreements Functioned as Usurious Loans.**

165.    The notion that the Defendants were acquiring future receipts was deceptive, misleading, and intended to obfuscate the true, usurious nature of the loans Defendants extended. In reality, the Defendants demanded payment of a precise "Purchased Amount," and guaranteed payment through its control over, and security interest in, all of Zoom's future receipts.

       a.     Each Agreement specified a precise dollar figure that Zoom must repay— the "Purchased Amount."

       b.     Until that precise dollar amount was repaid, Defendants exercised control and dominion over all of Zoom's receivables. The Agreements specifically provided "[YSC/GCF/HC] has purchased and shall own *all the Receipts described in this agreement up to the full Purchased Amount as the Receipts are created*."

       c.     To ensure repayment of the full amount, the Agreements required Zoom to grant a security interest in all of its assets, including all of its bank accounts and all accounts receivable, and required Zoom owner Timothy Matthews to execute a personal guaranty.

       d.     Belying the notion that the transactions involved a purchase of receipts, the collection of which Defendants bore risk, the Agreements also required Zoom and Mr. Matthews personally to execute a confession of judgment for the precise Purchased Amount set forth in the Agreements.

166.    The notion that the Defendants were acquiring only a "Specified Percentage" of Zoom's future receipts also was illusory.

       a.     Although each of the Agreements initially set a Specified Percentage of receipts between 10% and 25%, all but one of the Agreements provided that, upon the violation of any provision, representation, or warranty, or any event of default (broadly defined), "the Specified

Percentage shall equal 100%"—thereby entitling Defendants to every penny that hit Zoom's accounts.

b.    More important, each of the Agreements substituted the "Specified Percentage" for a specific dollar amount that Defendants would withdraw from Zoom's accounts, rain or shine. Whether in the Agreement, an Addendum, or an ACH Debit Authorization Form, in each instance Defendants substituted the "Specified Percentage" of future receipts for a specific "Daily Payment" or "Initial Daily Installment" that Defendants would take from Zoom's accounts.

167.   Because the Agreements required payment a specified "Purchased Amount" instead of actual receipts and extracted a specified daily or weekly withdrawal amount instead of a "Specified Percentage" of receipts, the Agreements compelled payment of a precise dollar amount over a definite term—*i.e.*, they functioned as loans. And because the repayment term was so short and the repayment amount so high, the loans were usurious.

168.   Moreover, because the Agreements required payment a specified "Purchased Amount" instead of actual receipts and extracted a specified daily or weekly withdrawal amount instead of a "Specified Percentage" of receipts, Defendants no longer bore the risk of Zoom's collections, as a true acquirer of receipts would. Rather, the Agreements empowered Defendants to seize the full daily withdrawal amount from Zoom's accounts irrespective of its actual rate of collections, until the full Purchased Amount was repaid.

169.   In the end, whether the Specified Percentage was 10%, 20%, or 100% did not matter. Zoom's payment obligations depended solely, and inexorably, on the "Purchased Amount"—*not* the pace of its collection of future receipts or any percentage thereof.

### iii.    Defendants Used Sham Reconciliation Provisions to Hide the Fact that They Sought Repayment of a Fixed Amount on a Fixed Timeline.

170.    Defendants employed sham reconciliation provisions they hoped would provide a patina of legitimacy while ensuring they collected the Purchased Amount on the schedule they demanded. The sham reconciliation provisions were designed to give the appearance the loans did not have a fixed payment amount or definite term.

171.    Under a legitimate reconciliation provision, if a merchant's fixed daily payments made to an MCA company exceed the applicable percentage of actual receivables, the merchant may seek a reduction in future payments to better reflect the correct proportion of receipts owed. In theory, if revenues decrease, so do payments.

172.    Defendants' Agreements each contained a reconciliation provision, but on terms designed to ensure Zoom never could take advantage of it.

173.    First, Defendants required Zoom to represent that the daily withdrawal amount set in the Agreement was a "good faith estimation" or "good faith approximation" of the Specified Percentage of future receipts.[11] That way, if Zoom complained the payment amount was too high, and that actual receipts were lower, that would constitute a breach of a representation and warranty, trigger Defendants' rights to accelerate the debt, transform the "Specified Percentage" into 100% of Zoom's receipts, and authorize Defendants to exercise all remedies upon default.

174.    Second, reconciliation remained entirely at Defendants' discretion. Five of the Yellowstone and World Global Agreements provided that the reconciliation mechanism was

---

[11] *See, e.g.*, Exs. C–G [Section 1.8] ("Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement equals the fair market value of such Receipts."); *see also, e.g.*, Exs. C–G [Addendum ¶ 1.a.] ("Merchant hereby requests and acknowledges that the Specified Percentage shall be revised to $[xxxx.xx] per business day (the 'Daily Payment') which the parties agree is a good-faith approximation of the Specified Percentage, based on the Merchant's receipts due to Yellowstone pursuant [to] the Agreement.").

provided "as a courtesy." Exs. C–G [Addendum ¶ 1.d.]. Two stated the Defendants were "under no obligation to provide same." Exs. C–D [Addendum ¶ 1.d.].

175.    Third, Defendants designed the reconciliation procedure to be impossible to exercise. Five of the Yellowstone and World Global Agreements only permitted Zoom to seek reconciliation once per month, required Zoom to provide all documents Defendants demanded in their "sole and absolute discretion," and provided that failure to produce such documentation within five business days was a basis to deny reconciliation. *See* Exs. C–H [Addendum]. The Funderz Agreements only permitted Zoom to seek reconciliation every two weeks, even as they authorized the Funderz Defendants to siphon off between $14,300 and $21,333 per day from Zoom's accounts. *See* Ex. I–K.

176.    Despite its deteriorating financial position, Zoom never was able to obtain a reconciliation of its payment amount. Rather than reducing Zoom's payment obligations when it fell behind, Defendants instead convinced Zoom to refinance, thereby securing additional fees and even higher interest rates.

177.    Upon information and belief, the Yellowstone Entities and Funderz.net do not have reconciliation departments, do not perform reconciliations, and have never refunded a merchant money under the reconciliation provisions.

178.    Federal and state regulators have found Defendants' reconciliation provisions in similar contracts to be shams.

179.    The New Jersey Attorney General undertook an investigation of Yellowstone.

180.    As part of this investigation, the New Jersey Attorney General reviewed Yellowstone's own documents.

181.    As part of this investigation, the New Jersey Attorney General also interviewed merchants regarding their experiences with Yellowstone's actual business practices.

182.    Based on this investigation, including a review of Yellowstone's own business records, the New Jersey Attorney General concluded that the reconciliation provision is a sham and that the transactions are actually loans.

183.    Specifically, the New Jersey Attorney General's investigation found that consumers were unable to modify daily payments through reconciliation.

184.    Working together, the Agreements' mechanisms that (i) replaced the purchase of receipts with a specific "Purchased Amount," (ii) replaced the "Specified Percentage" of receipts with a specific "Daily Payment" amount, and (iii) made reconciliation entirely discretionary and impossible to achieve served Defendants' ultimate goal and intent of requiring repayment of a specific amount on a specific timeline generating a specific (usurious) rate of return.

### iv.    Defendants Intentionally Disguised the True Nature of the Transactions to Create a Cycle of Short-term Loans.

185.    Despite their documented form, the transactions Zoom entered into with the Yellowstone Entities and Funderz.net are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

a.    The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

b.    The default and remedy provisions purported to hold Zoom absolutely liable for repayment of the Purchased Amount. The loans sought to obligate Zoom to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, Zoom would be in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

c.    The transaction was underwritten based upon an assessment of Zoom's credit worthiness; not the creditworthiness of any account debtor;

    d.   The Purchased Amount was not calculated based upon the fair market value of future receivables, but rather was unilaterally dictated by Defendants, based upon the interest rate they wanted to be paid;

    e.   The amount of the Daily Payments was determined based upon when Defendants wanted to be paid, and not based upon any good-faith estimate of the Zoom's future account receivables;

    f.   Defendants required Zoom to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected Defendants from any risk of loss resulting from the Zoom's failure to generate and collect receivables.

186.    But most important is intent: New York law looks to the intent of the parties in determining whether a transaction is a loan. Here, usurious intent can be discerned from internal negotiations, practices, and underwriting practices of Defendants. Defendants determined the payback based on the number of days in which they wanted to be paid back. The number of days for payback had no relation to the timing of the percentage of Zoom's receivables that Defendants were purporting to purchase.

187.    Emails between representatives of Yellowstone and Mr. Matthews show that there was a finite term for repayment, rendering these transactions loans.

188.    In some cases, the parties discussed the length of payback as a critical factor in the transaction and do not discuss any reference to percentage of receivables. For instance, on August 3, 2018, Mr. Matthews asked Yellowstone agent Raul Chavez, "Is it an option to extend the loan longer?" Chavez replied, "Sure, what would you be reasonably comfortable with?" When Matthews stated that he would like for the loan to be extended to 32 weeks, Chavez replied that the maximum extension was 25 weeks at a daily withdrawal of $2,395.

189.    This example demonstrates the intent: The transactions were designed to be a fixed term loan.

190.    Additionally, both the Yellowstone Entities and Funderz.net systemically offered refinancing to address merchant cash flow in order to reap additional benefit from its high-interest loans and avoid any reconciliation. Neither the Yellowstone Entities nor Funderz.net ever offered or agreed to a reconciliation based on the terms outlined in their respective agreements. Instead, Zoom was forced to enter into a new Secured Merchant Agreement to stay alive.

191.    Neither the Yellowstone Entities and Funderz.net wanted to offer reconciliation options to Zoom, instead, preferring to keep Zoom trapped and forced to continually refinance. Although Defendants represented to Zoom that their short-term financing would serve as a "bridge loan" until longer term financing could be secured at a better interest rate, there was never any intention of providing Zoom with longer-term financing options.  Instead, Defendants' goal was to keep Zoom locked into a cycle of short-term, high-interest loans, which is exactly what Defendants did.

192.    Additionally, when offering new agreements, both Yellowstone and Funderz.net operated under a series of subsidiaries and assumed names, further creating confusion about who was offering the loan. For instance, Mr. Matthews admitted that he did not know or understand that Hop Capital and Region Capital were in fact all one entity, Funderz.net. He believed he was dealing with different parties and not alter egos of the same MCA company.

193.    The use of multiple entities and alter egos further disguised the fact that Defendants were involved in a scheme to trap borrowers like Zoom in a cycle of debt.

194.    Defendants also required Mr. Matthews to execute confessions of judgment that Defendants could file if Zoom failed to make the required daily payments, and which World Global and Hop Capital both filed in July 2019.

195.    Yellowstone filed a confession of judgment against Zoom on July 31, 2019, in the Supreme Court of New York, Niagara County, in the amount of $166,267.06.

196.    Hop Capital filed a Confession of Judgment against Zoom on July 24, 2019, in the Supreme Court of New York, Niagara County, in the amount of $1,852,355.62.

197.    Defendants structured these transactions to function just like the loans they were intended to be and not the receivable purchases they purported to be.

E.     **The Actual Economics of the Transactions Belied the Defendants' Characterizations and Revealed their True Nature as Usurious Loans.**

198.    Defendants understood and intended the true, usurious nature of the loans they extended, as evidenced by their rapid, serial execution of MCA agreements on radically different terms.

199.    The Yellowstone Defendants and Funderz Defendants purported to engage in extensive due diligence concerning Zoom's business, accounts, and receipts (sometimes charging as much as $50,000 for such diligence).

200.    Had Defendants actually conducted such diligence, and intended to purchase a percentage of future receipts, they would not have entered into agreements on the terms provided.

201.    For example, the "Specified Percentages" contained in the Agreements cannot actually be "good faith approximations" of Zoom's receipts, because, if so, that would mean Defendants believed that, as Zoom was falling further into a debt spiral, Zoom's revenues were increasing dramatically. Extrapolating Zoom's projected receipts from the daily withdrawal amount assumed to be a "good faith estimate" of a proportion of revenues reveals the following:

| Date of Agreement | Defendant or Alter Ego Lending Funds | Daily Payment | Specified Percentage of Receipts | Assumed Daily Receipts | Assumed Annual Receipts[12] |
|---|---|---|---|---|---|
| June 17, 2017 | Yellowstone | $ 995.00 | 20% | $ 4,975 | $ 1,293,500 |
| July 17, 2017 | Yellowstone | $ 1,795.00 | 20% | $ 8,975 | $ 2,333,500 |
| Dec. 5, 2017 | Yellowstone | $ 1,595.00 | 20% | $ 7,975 | $ 2,073,500 |
| Aug. 3, 2018 | Grand Capital Funding | $ 2,284.00 | 20% | $ 11,420 | $ 2,969,200 |
| Sept. 28, 2018 | Grand Capital Funding | $ 4,769.00 | 25% | $ 19,076 | $ 4,959,760 |
| Dec. 12, 2018 | Hop Capital | $ 14,300.00 | 10% | $143,000 | $37,180,000 |
| Jan. 7, 2019 | Grand Capital Funding | $ 7,889.00 | 25% | $ 31,556 | $ 8,204,560 |
| Feb. 19, 2019 | Hop Capital | $ 17,000.00 | 10% | $ 170,000 | $ 44,200,000 |
| Mar. 19, 2019 | Region Capital | $ 21,333.00 | 10% | $ 213,330 | $ 55,465,800 |

202.   On information and belief, Yellowstone knew that Zoom's daily receipts were not projected to nearly double between June 17, 2017, and July 17, 2017.

203.   On information and belief, World Global d/b/a Grand Capital Funding knew that Zoom's daily receipts were not projected to nearly double between August 3, 2018, and September 28, 2018, and that its receipts were not expected to increase by another 65% between September 28, 2018, and January 7, 2019.

204.   On information and belief, Funderz.net d/b/a Hop Capital d/b/a Region Capital knew that, as of February 19, 2019, Zoom's daily receipts were not projected to be $143,000 and that its annual revenues were not projected to exceed $37 million—each an order of magnitude higher than prior projections. On information and belief, Funderz.net d/b/a Hop Capital d/b/a Region Capital further knew that Zoom's receipts and revenues were not projected to grow another 25% between February 19, 2019, and March 19, 2019, and that its annual revenues as of March 19, 2019 were not projected to exceed $55 million.

---

[12] Based on a year containing 260 business days.

205.    Rather, on information and belief, the Defendants calculated the daily withdrawal amount as a function of the return they desired to achieve, the time frame within which they desired to achieve it, and the maximum amount the Defendants believed Zoom might be able to sustain long enough for the Defendants to make the desired return or a still healthy return on their investment.

206.    For example, Yellowstone lent Zoom $50,000 on June 19, 2017. It lent Zoom twice as much money ($100,000) one month later, on July 19, 2017. In order to reap a similar return (45.9% versus 49.9%) in a similar time period (81 business days versus 75 business days), Yellowstone needed to collect almost twice as much money from Zoom every day ($1,795 versus $995). Yet both daily withdrawal amounts ($1,795 and $995) were purported to be "good faith approximations" of the same Specified Percentage (20%) of Zoom's future receipts.

207.    Similarly, World Capital d/b/a Grand Capital Funding lent Zoom $370,000 on September 28, 2018 and substantially more money ($500,000) a few months later, on January 19, 2019. In order to reap the same return (49.9% for both) in less time (95 business days versus 116 business days), thereby protecting against the increasing risk of default, World Global needed to collect substantially more money from Zoom every day ($7,889 versus $4,769). Yet both daily withdrawal amounts ($7,889 and $4,769) were purported to be "good faith approximations" of the same Specified Percentage (25%) of Zoom's future receipts.

208.    Similarly, Funderz.net d/b/a Hop Capital lent Zoom $1,715,000 on February 19, 2019. Funderz.net d/b/a Region Capital lent Zoom $400,000 one month later, on March 19, 2019. The February 19, 2019 loan sought to earn a 40% return in 141 business days by withdrawing $17,000 daily, whereas the March 19, 2019 loan sought to earn a 60% return in just 30 business days by withdrawing $21,333 daily. Despite having different daily withdrawal amounts, both

Agreements executed by the same party described those amounts as a "good faith approximation" of the same Specified Percentage (10%) of Zoom's receipts—implying radically different annual revenues ($44 million versus $55 million).

209.    All the legitimate financial institutions and factoring companies declined to offer Zoom financing. They recognized that the funds advanced to Zoom by ITG were held for the benefit of ITG and to be used exclusively in providing the Marketing Services.

210.    Defendants extended Zoom financing on the terms provided because they did not care whether the Purchased Amount was a fair approximation of the specified percentage of Zoom's receipts, or even whether Zoom remained in business. Defendants simply cared whether they could recoup their investment and as high a usurious interest rate as possible.

   **F.    The Yellowstone and Funderz Agreements were Substantively and Procedurally Unconscionable.**

211.    The Yellowstone and Funderz Agreements were unconscionable contracts of adhesion that were not negotiated at arms-length.

212.    Instead, they contained one-sided terms that preyed upon the desperation of Zoom and its individual owner and helped conceal the true, illegal nature of the usurious loans.

213.    Among these one-sided terms, the Yellowstone and Funderz Agreements included: (1) representations and warranties that applied only to the merchant, (2) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name; (3) a provision preventing the merchant from transferring, moving, or selling the business or any assets without permission from the MCA company; (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's fees but not the other way around; (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction; (6) a personal guaranty,

the revocation of which was an event of default; (7) a jury trial waiver; (8) a class action waiver; (9) a collateral and security agreement providing a UCC lien over all the merchant's assets; (10) a prohibition of obtaining financing from another source; (11) the maintenance of business interruption insurance; (12) an assignment of lease of merchant's premises in favor of the MCA company; (13) the right to direct all credit card processing payments to the MCA company; (14) a power-of-attorney to take "any and all action" necessary to direct new or additional credit card processors to make payments to the MCA company; and (15) a power authorizing the MCA company to take any action or execute any instrument or document to settle all obligations due.

214.    The Yellowstone and Funderz Agreements also were unconscionable because they contained numerous knowingly false statements, including the following: (1) the transaction was not a loan; (2) the purchased amount was a good faith estimate of the specified percentage of the merchant's receivables; (3) the daily payment amount was a good-faith approximation of the specified percentage of the merchant's daily receivables; (4) the daily payment amount would be conditioned on Zoom's sale of products and services and payment therefor by Zoom's customers; (5) the fixed daily payment was for the merchant's convenience; and (6) the automated ACH program was labor intensive and not an automated process, requiring the MCA company to charge exorbitant underwriting and/or origination fees.

215.    The Yellowstone and Funderz Agreements also were unconscionable because they were designed to fail. Among other things, they were designed to result in default in the event that the merchant's business suffered any downturn by (1) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision; (2) preventing the merchant from obtaining other financing; and (3) requiring the merchant to continuously represent and

warrant that there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of merchant.

216.    The Yellowstone and Funderz Agreements also contained numerous improper penalties that violate New York's strong public policy. Among these improper penalties, they (1) required the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerated the entire debt upon an Event of Default, and (3) required the merchant to turn over 100% of its receivables if it missed just one fixed daily payment.

## FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962(c))
**(as successor in interest to Zoom against the Yellowstone Defendants)**

### A.    Culpable Persons

217.    ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

218.    Yellowstone, World Global, Capital Merchant, Green Capital, Midnight Capital, Glass, Stern, and Davis, along with Max Recovery Group, LLC ("Max Recovery"), were engaged in a common enterprise with a shared goal of soliciting, funding, servicing, and collecting on the usurious loans extended to Zoom (the "Yellowstone Enterprise").

219.    Glass, Stern, and Davis are all RICO "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

220.    At all relevant times, each of Glass, Stern, and Davis was a person that exists separate and distinct from the Yellowstone Enterprise.

221.    Glass has an ownership interest in Yellowstone and is the mastermind of the Yellowstone Enterprise. During the relevant time period, Glass (jointly with Stern) controlled transactions within the Yellowstone Enterprise.

222.    Upon information and belief, Stern has an ownership interest in Yellowstone, was the Chief Executive Officer of Yellowstone at all relevant times. During the relevant time period, Stern (jointly with Glass) controlled transactions within the Enterprise and had authority to execute contracts on behalf of the Enterprise.

223.    Upon information and belief, at all relevant times, Davis had an ownership interest in Yellowstone and was the Director of Underwriting at Yellowstone. Although it is believed that his status with Yellowstone changed in August 2018, upon information and belief, he continued assisting with collections after that date.

224.    Through their operation of Yellowstone, Glass, Stern, and Davis solicited, underwrote, funded, serviced and collected unlawful debt.

### B.    The Yellowstone Enterprise

225.    Yellowstone, World Capital, Capital Merchant, Green Capital, Midnight Capital, Glass, Stern, Davis, and Max Recovery constitute an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

226.    Yellowstone, World Capital, Capital Merchant, Green Capital, Midnight Capital, Glass, Stern, Davis, and Max Recovery are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Yellowstone Enterprise have a common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

227.    The Yellowstone Enterprise issued usurious loans under the guise of Secured Merchant Agreements to borrowers such as Zoom, facing financial distress and who lack sophistication of experienced borrowers and who have little familiarity with the MCA industry.

228.    At all relevant times, the Yellowstone Enterprise members have had ongoing relations with each other through common control/ownership, shared personnel, and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued to small businesses throughout the United States.

229.    The debt, including such debt evidenced by the Yellowstone Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes; and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

### C.    The Roles of the RICO Persons in Operating the Yellowstone Enterprise, and the Roles of the Individual Companies within the Enterprise

230.    At all relevant times, Glass, Stern, and Davis organized themselves and the Yellowstone Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.

### i.    Glass

231.    Glass was an owner and the mastermind of the Yellowstone Enterprise.

232.    Together with Stern and Davis, Glass was responsible for the day-to-day operations of the Yellowstone Enterprise and has final say on all financial decisions, including, without limitation, which usurious loans the Yellowstone Enterprise would fund, how such loans would be

funded, which of investors would fund each loan and the ultimate payment terms, amount, and period of each usurious loan.

233.    In his capacity as the mastermind of the Yellowstone Enterprise, Glass, together with Stern, was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Yellowstone Enterprise to accomplish its common goals and purposes, including: (i) the form of secured merchant agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Yellowstone Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used to collect upon the unlawful debt if the borrower defaulted upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, the loans extended to Zoom.

234.    Glass has also taken actions and directed other members of the Yellowstone Enterprise to take actions necessary to accomplish the overall goals and purposes of the Yellowstone Enterprise including directing its affairs, funding the Yellowstone Enterprise, directing its members to collect upon the unlawful loans, and executing legal documents in support of the Yellowstone Enterprise.

235.    Upon information and belief, although Glass purported to have divested from Yellowstone, Glass in fact maintained an interest at all relevant times, operating the company through Stern.

236.    Glass has ultimately benefited from the Yellowstone Enterprise's funneling of the usurious loan proceeds through the Yellowstone Entities to himself, Stern, and Davis.

### ii.    Stern

237.    Stern is an owner of Yellowstone and was its Chief Executive Officer at all relevant times. Together with Glass, Stern was responsible for the day-to-day operations of the Yellowstone

Enterprise and had final say on all business decisions, including, without limitation, which usurious loans the Yellowstone Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount, and period of each usurious loan.

238.    In his capacity as the day-to-day leader of the Yellowstone Enterprise, Stern, together with Glass, was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Yellowstone Enterprise to accomplish its common goals and purposes including: (i) the form of secured merchant agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Yellowstone Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used to collect upon the unlawful debt if the borrower defaulted upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, the loans extended to Zoom.

239.    Stern has also taken actions and directed other member of the Yellowstone Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

240.    Stern has ultimately benefited from the Yellowstone Enterprise's funneling of the usurious loan proceeds through the Yellowstone Entities to himself, Glass, and Davis.

### iii.    Davis

241.    Tsvi Davis is an owner of Yellowstone and, upon information and belief, was its Director of Underwriting at all relevant times. Davis was responsible for the day-to-day funding operations of the Yellowstone Enterprise and contributed to funding decisions of the Yellowstone

Enterprise including, without limitation, which usurious loans would be funded, how such loans will be funded, who would fund each loan, and the ultimate payment terms, amount, and period of each usurious loan.

242.    As Director of Underwriting for the Yellowstone Enterprise, Davis was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Yellowstone Enterprise to accomplish its common goals and purposes including: (i) the form of secured merchant agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Yellowstone Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used to collect upon the unlawful debt if the borrower defaulted upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, the loans extended to Zoom.

243.    Davis has also taken actions and directed other members of the Yellowstone Enterprise to take actions necessary to accomplish its overall goals and purposes, including directing its affairs, funding the Yellowstone Enterprise, soliciting and recruiting members, directing members to collect upon the unlawful loans, and executing legal documents in support of the Yellowstone Enterprise.

244.    Davis has ultimately benefited from the Yellowstone Enterprise's funneling of the usurious loan proceeds through the Yellowstone Entities to himself, Glass, and Stern.

### iv.    Yellowstone, World Global, Capital Merchant Services, Green Capital, and Midnight Capital

245.    Yellowstone is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Max Recovery. World Global, Capital Merchant, Green Capital, and Midnight are wholly owned and controlled by Yellowstone.

246.     Glass, Stern, Davis have operated Yellowstone as part of an unlawful enterprise to collect upon unlawful debt. As members of the Yellowstone Enterprise, the Yellowstone Entities have: (i) entered into contracts with brokers to solicit borrowers for the Yellowstone Enterprise's usurious loans; (ii) entered into participation agreements with investors to fund the usurious loans; (iii) pooled the funds of investors to fund the usurious loans; (iv) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (v) entered into sham merchant agreements on behalf of the Yellowstone Enterprise; (vi) serviced the usurious loans; (viii) set-up and implemented the ACH withdrawals used by the Yellowstone Enterprise to collect upon the unlawful debt; and (ix) obtained judgments to further collect upon the unlawful debt.

247.     In this case, the Yellowstone Enterprise: (i) solicited borrowers; (ii) pooled funds from investors to fund the Secured Merchant Agreements; (iii) underwrote the Yellowstone Agreements; (iv) entered into the Yellowstone Agreements; and (v) collected upon the unlawful debt evidenced by the Yellowstone Agreements by effecting daily ACH withdrawals from the bank accounts of Zoom.

### v.     Max Recovery

248.     Max Recovery is a debt collection company affiliated with Yellowstone. It is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Yellowstone, World Global, Capital Merchant, Green Capital, and Midnight Capital.

249.     Upon default of a borrower's obligations under the usurious loan agreements and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, at the direction of the Yellowstone Entities, Max Recovery prepares and files Confessions of Judgment that falsely represent the transactions constitute the sale and purchase of future receivables in order to conceal

the usurious and unlawful nature of the transactions and induce Courts of New York and elsewhere to enter judgments in favor of the Yellowstone Entities.

250.    On behalf of World Global, attorney Vadim Serebro with Max Recovery filed a Confession of Judgment by Zoom in favor of World Global on July 31, 2019. This Confession of Judgment was based on outstanding sums of principal and usurious interest allegedly owed to World Global.

###     D.     Interstate Commerce

251.    The Yellowstone Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

252.    Specifically, members of the Yellowstone Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in North Carolina, including Zoom, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

253.    In the present case, all communications between the members of the Yellowstone Enterprise and Zoom were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails and wires to originate, underwrite, service and collect upon the Yellowstone Agreements, fund the advances under each of the Yellowstone Agreements and collect the daily withdrawals via interstate electronic ACH debits.

254.    In addition, at the direction of Yellowstone and World Global, each of the Yellowstone Agreements was executed in North Carolina, and original copies of the Yellowstone Agreements and the applicable Confession of Judgment Affidavits were sent from North Carolina

to the Yellowstone Enterprise through Yellowstone and World Global, at their office in New Jersey via Federal Express, using labels prepared by Yellowstone and/or World Global.

### E.   Injury and Causation

255.   Zoom has been injured in its business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c) in an amount to be determined at trial.

256.   The injuries to Zoom directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

257.   ITG, as successor in interest to Zoom's claims, is entitled to recovery.

258.   ITG, as successor in interest to Zoom's claims, has incurred attorneys' fees and costs associated with exposing and prosecuting the Yellowstone Enterprise's criminal activity.

259.   Pursuant to 18 U.S.C. § 1964(c), ITG is entitled to treble damages, plus costs and attorneys' fees.

<u>**SECOND CAUSE OF ACTION**</u>
<u>**(CONSPIRACY UNDER 18 U.S.C. § 1962(d))**</u>
**(as successor in interest to Zoom against the Yellowstone Defendants)**

260.   ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

261.   Yellowstone, World Global, Capital Merchant, Green Capital, Midnight Capital, and Max Recovery, along with Glass, Stern, and Davis have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

262.   By and through each of their business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and their frequent email communications concerning the underwriting, funding, servicing and collection of the unlawful

loans, including the Yellowstone Agreements, the members of the Yellowstone Enterprise knew its nature, and each individual member knew that the Yellowstone Enterprise extended beyond its individual role. Moreover, through the same connections and coordination, each individual member knew that the other members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

263.    Each individual member agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Yellowstone Enterprise's affairs in order to collect upon unlawful debts, including the Yellowstone Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each individual member was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the members shared a common purpose, namely the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund, and collect upon unlawful debt, including the Yellowstone Agreements.

264.    Zoom has been injured in its business and property by reason of the Yellowstone Enterprise's violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

265.    The injuries to the Zoom directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected usurious loan payments.

266.    ITG, as successor in interest to Zoom's claims, is entitled to recovery.

267.    ITG, as successor in interest to Zoom's claims, has also incurred attorneys' fees and costs associated with exposing and prosecuting the Yellowstone Defendants' criminal activities.

268.    Pursuant to 18 U.S.C. § 1964(c) and (d), ITG is entitled to treble damages, plus costs and attorneys' fees from the Yellowstone Defendants.

## THIRD CAUSE OF ACTION
### (RICO 18 U.S.C. § 1962(c))
**(as successor in interest to Zoom against the Funderz Defendants)**

**A.      Culpable Persons**

269.    ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

270.    Funderz.Net and the Isaacovs were engaged in a common enterprise with a shared goal of soliciting, funding, servicing, and collecting on the usurious loans extended to Zoom (the "Funderz Enterprise").

271.    Joseph and Gabe Isaacov are RICO "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

272.    At all relevant times, each of the Isaacovs was a person that exists separate and distinct from the Funderz Enterprise.

273.    Joseph Isaacov has an ownership interest in Funderz.net and is the mastermind of the Funderz Enterprise. During the relevant time period, Joseph Isaacov, along with Gabe Isaacov, controlled transactions within the Funderz Enterprise.

274.    During the relevant time period, Joseph Isaacov purported to be the manager of Hop Capital, an alter ego of Funderz.net. During the relevant time period, Joseph Isaacov controlled transactions within the Enterprise. For instance, Joseph Isaacov approved Hop Capital's advancement of $852,651 to Zoom as part of the February 19, 2019 Agreement.

275.    During the relevant time period, Gabe Isaacov (jointly with Joseph) controlled transactions within the Funderz Enterprise and had authority to execute contracts on behalf of the Enterprise.

276.    Through their operation of Funderz.net and its various alter egos, the Isaacovs solicited, underwrote, funded, serviced, and collected unlawful debt.

**B.    The Funderz Enterprise**

277.    Funderz.net and the Isaacovs constitute an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

278.    Funderz.net and its alter egos are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Funderz Enterprise has a common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

279.    The Funderz Enterprise issued usurious loans under the guise of Secured Merchant Agreements to borrowers such as Zoom, facing financial distress and who lack sophistication of experienced borrowers and who have little familiarity with the MCA industry.

280.    At all relevant times, the Funderz Enterprise members have had ongoing relations with each other through common control/ownership, shared personnel, and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued to small businesses throughout the United States.

281.    The debt, including such debt evidenced by the Funderz Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes; and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

**C.    The Roles of RICO Persons Operating the Funderz Enterprise, and the Role of the Companies Within the Enterprise.**

282.    At all relevant times, the Isaacovs organized themselves and the Funderz Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to

operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.

> ### i.    Joseph Isaacov

283.    Joseph Isaacov is responsible for the day-to-day operations of the Funderz Enterprise and has final say on all business decisions, including, without limitation, which usurious loans the Funderz Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount, and period of each usurious loan.

284.    In his capacity as a member of the Enterprise, Joseph Isaacov, along with his brother Gabe, is responsible for creating, approving and implementing the policies, practices, and instrumentalities used by the Funderz Enterprise to accomplish its common goals and purposes including: (i) the form of secured merchant agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Funderz Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used to collect upon the unlawful debt if the borrower defaulted upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, the loans extended to Zoom.

285.    Joseph Isaacov has also taken actions and directed other members of the Funderz Enterprise to take actions necessary to accomplish its overall goals and purposes, including directing its affairs, funding the Funderz Enterprise, soliciting and recruiting members, directing members to collect upon the unlawful loans, and executing legal documents in support of the Funderz Enterprise.

286.    Joseph Isaacov has ultimately benefited from the Funderz Enterprise's funneling of the usurious loan proceeds to the Isaacovs.

### ii.    Gabe Isaacov

287.    Together with Joseph, Gabe Isaacov is responsible for the day-to-day operations of the Funderz Enterprise and has final say on all business decisions, including, without limitation, which usurious loans the Funderz Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount, and period of each usurious loan.

288.    In his capacity as a member of the Enterprise, Gabe Isaacov, along with Joseph, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Funderz Enterprise to accomplish its common goals and purposes including: (i) the form of secured merchant agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Funderz Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used to collect upon the unlawful debt if the borrower defaulted upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, the loans extended to Zoom.

289.    Gabe Isaacov has also taken actions and directed other members of the Funderz Enterprise to take actions necessary to accomplish its overall goals and purposes, including directing its affairs, funding the Funderz Enterprise, soliciting and recruiting members, directing members to collect upon the unlawful loans, and executing legal documents in support of the Funderz Enterprise.

290.    Gabe Isaacov has ultimately benefited from the Funderz Enterprise's funneling of the usurious loan proceeds to the Isaacovs.

### iii.    Funderz.net and its assumed names

291.    Funderz.net is a separate legal entity that is organized under the laws of New York and has a legal existence separate and apart from the other members of the Funderz Enterprise. Funderz.net maintains its own books and records.

292.    The Isaacovs have operated Funderz.net as part of an unlawful enterprise to collect upon unlawful debt. Pursuant to its membership in the Funderz Enterprise, Funderz.net, operating through assumed names, including Hop Capital and Region Capital, has: (i) entered into contracts with brokers to solicit borrowers for the Funderz Enterprise's usurious loans; (ii) entered into participation agreements with investors to fund the usurious loans; (iii) pooled the funds of investors to fund the usurious loans; (iv) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (v) entered into the so-called merchant agreements on behalf of the Funderz Enterprise; (vi) serviced the usurious loans; (viii) set-up and implemented the ACH withdrawals used by the Funderz Enterprise to collect upon the unlawful debt; and (ix) obtained judgments in its name to further collect upon the unlawful debt.

293.    In this case, the Funderz Enterprise: (i) solicited borrowers; (ii) pooled funds from investors to fund the Secured Merchant Agreements; (iii) underwrote the Funderz Agreements; (iv) entered into the Funderz Agreements; and (v) collected upon the unlawful debt evidenced by the Funderz Agreements by effecting daily ACH withdrawals from the bank accounts of Zoom.

### D.    Interstate Commerce

294.    The Funderz Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

295.    Specifically, members of the Funderz Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service, and collect upon the usurious loans made by the Enterprise to entities in North Carolina, including Zoom, and throughout the

United States via extensive use of interstate emails, mail, wire transfers, and bank withdrawals processed through an automated clearing house.

296.    In the present case, all communications between the members of the Funderz Enterprise and Zoom were by interstate email and mail, wire transfers, or ACH debits and other interstate wire communications. Specifically, the Funderz Enterprise used interstate emails and wires to originate, underwrite, service, and collect upon the Funderz Agreements, fund the advances under each of the Funderz Agreements and collect the daily withdrawals via interstate electronic ACH debits.

297.    In addition, at the direction of Funderz.net, each of the Funderz Agreements was executed in North Carolina.

### E.    Injury and Causation

298.    Zoom has been injured in its business and property by reason of the Funderz Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

299.    The injuries to Zoom directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcements of judgments.

300.    ITG, as successor in interest to Zoom's claims, is entitled to recovery.

301.    ITG, as successor in interest to Zoom's claims, has incurred attorneys' fees and costs associated with exposing and prosecuting the Funderz Enterprise's criminal activity.

302.    Pursuant to 18 U.S.C. § 1964(c), ITG is entitled to treble damages, plus costs and attorneys' fees.

## FOURTH CAUSE OF ACTION
## (CONSPIRACY UNDER 18 U.S.C. § 1962(d))
### (as successor in interest to Zoom against the Funderz Defendants)

303.    ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

304.    Funderz.net and the Isaacovs have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

305.    By and through each of their business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and their frequent email communications concerning the underwriting, funding, servicing, and collection of the unlawful loans, including the Funderz Agreements, the members of the Funderz Enterprise knew its nature, and each individual member knew that the Funderz Enterprise extended beyond its individual role. Moreover, through the same connections and coordination, each individual member knew that the other members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

306.    Each individual member agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Funderz Enterprise's affairs in order to collect upon unlawful debts, including the Funderz Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each individual member was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the members shared a common purpose, namely the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund, and collect upon unlawful debt, including the Funderz Agreements.

307.    Zoom has been injured in its business and property by reason of the Funderz Enterprise's violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

308.    The injuries to Zoom directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected loan payments.

309.    ITG, as successor in interest to Zoom's claims, is entitled to recovery.

310.    ITG, as successor in interest to Zoom's claims, has also incurred attorneys' fees and costs associated with exposing and prosecuting the Funderz Enterprise Defendants' criminal activities.

311.    Pursuant to 18 U.S.C. § 1964(c) and (d), ITG is entitled to treble damages, plus costs and attorneys' fees from the Funderz Enterprise Defendants.

### FIFTH CAUSE OF ACTION
### (RICO 18 U.S.C. § 1962(c))
**(Direct Claim against the Yellowstone Defendants)**

312.    ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

313.    ITG was a creditor of Zoom, advancing millions of dollars to Zoom to perform the Marketing Services and fulfill the ITG contracts. Indeed, ITG was Zoom's principal creditor and client.

314.    The unconscionable repayment terms under the Yellowstone Agreements made it impossible for Zoom to operate and fulfill its obligations to ITG, despite the huge amount of credit that ITG had advanced Zoom.

315.    Despite Zoom being unable to perform its obligations to ITG by August 2018, the Yellowstone Entities continued to enter into Secured Merchant Agreements with Zoom, which bled Zoom of millions of dollars in additional funds that had been advanced by ITG. The Yellowstone Agreements did not stabilize Zoom and allow it to perform its obligations to ITG. Instead, due to the usurious interest rates under the Yellowstone Agreements, Zoom was driven deeper into debt, losing more and more of ITG's funds.

316.     ITG received no benefit from Zoom entering into the Yellowstone Agreements. Zoom was still unable to perform its obligations to ITG. However, ITG was directly harmed by the Yellowstone Agreements and the debt spiral they created for Zoom. Had Zoom never entered into these sham MCA Agreements, more of the money ITG advanced to Zoom would have been able to fulfill more of its obligations under the ITG contracts or, alternatively, repay ITG for the obligations Zoom could no longer perform.

317.     Additionally, throughout the course of their dealings with Zoom, the Yellowstone Enterprise performed due diligence, gained intimate knowledge of Zoom's financial situation, and therefore had actual or constructive notice that the funds advanced by ITG to Zoom were being held by Zoom for the benefit of ITG and remained ITG's funds.

318.     The Yellowstone Entities knew or should have known that Zoom had sought out other sources of financing prior to entering into the Yellowstone Agreements. The Yellowstone Entities knew or should have known that Zoom had been rejected by other lending institutions and financing companies due to its financial situation, cash flow, and future performance obligations to ITG.

319.     After performing due diligence, the Yellowstone Entities knew that ITG had advanced Zoom the funds with which to perform the Marketing Services and therefore, knew that the funds advanced by ITG to Zoom were being held by Zoom for the benefit of ITG and remained ITG's funds. Accordingly, the Yellowstone Entities knew that they were not entitled to collect on those funds and that to do so would be unconscientious, inequitable, and would cause harm to ITG. The Yellowstone Entities did not care.

320.     Despite being fully aware of the status of the Zoom's relationship with ITG and the advances ITG made to Zoom, the Yellowstone Enterprise knowingly withdrew funds from Zoom's

account that were specifically held for the benefit of ITG, earmarked for performance under the ITG contracts, and remained ITG Funds.

321.    World Global falsely claimed that Zoom owed it approximately $140,000 in payments under the Yellowstone Agreements. Citing the sham Security Agreement in the January 7, 2019 Agreement, World Global contacted Zoom's clients, including ITG, claiming a security interest in Zoom's accounts receivable and demanding the remission of funds directly to World Global pursuant to UCC Article 9-406.

322.    By knowingly withdrawing ITG's funds to which the Yellowstone Enterprise was not entitled, ITG has been injured in its business and property by reason of the Yellowstone Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

323.    The injuries to ITG directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, millions of dollars in improperly collected funds held for the benefit of, and belonging to, ITG.

324.    ITG has incurred attorneys' fees and costs associated with exposing and prosecuting the Yellowstone Enterprise's criminal activity.

325.    Pursuant to 18 U.S.C. § 1964(c), ITG is entitled to treble damages, plus costs and attorneys' fees.

**SIXTH CAUSE OF ACTION**
**(CONSPIRACY UNDER 18 U.S.C. § 1962(d))**
**(Direct Claim against the Yellowstone Defendants)**

326.    ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

327.    Yellowstone, World Global, Capital Merchant, Green Capital, Midnight Capital, and Max Recovery, along with Glass, Stern, and Davis have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate ITG's rights under 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

328.    By and through each of their business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and their frequent email communications concerning the underwriting, funding, servicing, and collection of the unlawful loans, including the Yellowstone Agreements, the members of the Yellowstone Enterprise knew its nature, and each individual member knew that the Yellowstone Enterprise extended beyond its individual role. Moreover, through the same connections and coordination, each individual member knew that the other members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

329.    Each individual member agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Yellowstone Enterprise's affairs in order to collect upon unlawful debts, including the Yellowstone Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each individual member was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the members shared a common purpose, namely the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund, and collect upon unlawful debt, including the Yellowstone Agreements.

330.    ITG has been injured in its business and property by reason of the Yellowstone Enterprise's violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

331.    The injuries to ITG directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

332.    ITG has also incurred attorneys' fees and costs associated with exposing and prosecuting the Yellowstone Defendants' criminal activities.

333.    Pursuant to 18 U.S.C. § 1964(c) and (d), ITG is entitled to treble damages, plus costs and attorneys' fees from the Yellowstone Defendants.

### SEVENTH CAUSE OF ACTION
### (RICO 18 U.S.C. § 1962(c))
### (Direct Claim against the Funderz Defendants)

334.    ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

335.    ITG was a creditor of Zoom, advancing millions of dollars to Zoom to perform the Marketing Services and fulfill the ITG contracts. Indeed, ITG was Zoom's principal creditor and client.

336.    The unconscionable repayment terms under the Funderz Agreements made it impossible for Zoom to operate and fulfill its obligations to ITG, despite the huge amount of credit that ITG had advanced Zoom.

337.    Despite Zoom being unable to perform its obligations to ITG by August 2018, Funderz.net continued to enter into Secured Merchant Agreements with Zoom, which bled Zoom of millions of dollars in additional funds that had been advanced by ITG. The Funderz Agreements did not stabilize Zoom and allow it to perform its obligations to ITG. Instead, due to the usurious interest rates under the Funderz Agreements, Zoom was driven deeper into debt, losing more and more of ITG's funds.

338.    ITG received no benefit from Zoom entering into the Funderz Agreements. Zoom was still unable to perform its obligations to ITG. However, ITG was directly harmed by the Funderz Agreements and the debt spiral they created for Zoom. Had Zoom never entered into these sham MCA Agreements, more of the money ITG advanced to Zoom would have been able to fulfill more of its obligations under the ITG contracts or, alternatively, repay ITG for the obligations Zoom could no longer perform.

339.     Additionally, throughout the course of their dealings with Zoom, the Funderz Enterprise performed due diligence, gained intimate knowledge of Zoom's financial situation, and therefore had actual or constructive notice that the funds advanced by ITG to Zoom were being held by Zoom for the benefit of ITG and remained ITG's funds.

340.     The Funderz Enterprise knew or should have known that Zoom had sought out other sources of financing prior to entering into the Funderz Agreements. The Funderz Enterprise knew or should have known that Zoom had been rejected by other lending institutions and financing companies due to its financial situation, cash flow, and future performance obligations to ITG.

341.     After performing due diligence, the Funderz Defendants knew that ITG had advanced Zoom the funds with which to perform the Marketing Services and therefore, knew that the funds advanced by ITG to Zoom were being held by Zoom for the benefit of ITG, and remained ITG's funds. The Funderz Defendants knew that they were not entitled to collect on those funds and that to do so would be unconscientious, inequitable, and would cause harm to ITG. The Funderz Defendants did not care.

342.     Despite being fully aware of the status of the Zoom's relationship with ITG and the advances ITG made to Zoom, the Funderz Enterprise knowingly withdrew funds from Zoom's account that were specifically held for the benefit of ITG, earmarked for performance under the ITG contracts, and remained ITG Funds.

343.     Funderz.net, operating as Hop Capital, falsely claimed that Zoom owed it approximately $1.9 million in payments under the Funderz Agreements. Citing the sham Security Agreement in the December 12, 2018 Agreement, Funderz.net contacted Zoom's clients, including ITG, claiming a security interest in Zoom's accounts receivable and demanding the remission of funds directly to Hop Capital pursuant to UCC Article 9-406.

344.   By knowingly withdrawing ITG's funds to which the Funderz Enterprise was not entitled, ITG has been injured in its business and property by reason of the Funderz Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

345.   The injuries to ITG directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, millions of dollars in improperly collected funds held for the benefit of and belonging to ITG.

346.   ITG has incurred attorneys' fees and costs associated with exposing and prosecuting the Funderz Enterprise's criminal activity.

347.   Pursuant to 18 U.S.C. § 1964(c), ITG is entitled to treble damages, plus costs and attorneys' fees.

### EIGHTH CAUSE OF ACTION
### (CONSPIRACY UNDER 18 U.S.C. § 1962(d))
#### (Direct Claim against the Funderz Defendants)

348.   ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

349.   Funderz.net and the Isaacovs have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to harm ITG as described above in violation of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

350.   By and through each of their business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and their frequent email communications concerning the underwriting, funding, servicing, and collection of the unlawful loans, including the Funderz Agreements, the members of the Funderz Enterprise knew its nature, and each individual member knew that the Funderz Enterprise extended beyond its individual role. Moreover, through the same connections and coordination, each individual member knew that the other members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

351.    Each individual member agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Funderz Enterprise's affairs in order to collect upon unlawful debts, including the Funderz Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each individual member was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the members shared a common purpose, namely the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund, and collect upon unlawful debt, including the Funderz Agreements.

352.    ITG has been injured in its business and property by reason of the Funderz Enterprise's violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

353.    The injuries to ITG directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

354.    ITG has also incurred attorneys' fees and costs associated with exposing and prosecuting the Funderz Enterprise Defendants' criminal activities.

355.    Pursuant to 18 U.S.C. § 1964(c) and (d), ITG is entitled to treble damages, plus costs and attorneys' fees from the Funderz Enterprise Defendants.

**NINTH CAUSE OF ACTION**
**(DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201)**
**(as successor in interest to Zoom against the Yellowstone Defendants)**

356.    ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

357.    There is an actual, present, justiciable controversy and dispute among the parties that is ripe for resolution under 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, specifically whether the Yellowstone Agreements charged interest in excess of the highest rate allowable by law.

358.    The Yellowstone Agreements provided:

In no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that [YCL/GCF] has charged or received interest hereunder in excess of the highest rate allowable by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and [YCL/GCF] shall promptly refund to Merchant any interest received by [YCL/GCF] in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that [YCL/GCF] not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.[13]

359.    ITG contends that the Yellowstone Agreements constituted loans and not the purchase and sale of accounts receivable, whereas the Yellowstone Defendants contend the opposite.

360.    ITG further contends that payments made by Zoom to the Yellowstone Defendants constituted repayment of principal and interest thereon.

361.    ITG further contends that the interest rates charged in the Yellowstone Agreements exceeded the highest rate allowable by law.

362.    ITG, as successor in interest to Zoom, is entitled to a judgment declaring that (i) the Yellowstone Agreements constituted loans and not purchases of accounts receivable; (ii) the interest rates charged in the Yellowstone Agreements exceeded the highest rate allowable under law; (iii) the interest rates under the Yellowstone Agreements must be reduced to the maximum rate permitted by applicable law; and (iv) the Yellowstone Defendants must promptly refund to

---

[13] See Exs. C–G Section 1.8 [June 19, 2017 Agreement; July 17, 2017 Agreement; December 5, 2017 Agreement; August 3, 2018 Agreement; September 28, 2018 Agreement.] The January 9, 2019 Agreement provided that "If . . . a court having jurisdiction over this Agreement and the parties hereto shall have determined that GCF has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate of such interest received by GCF shall automatically be reduced to the maximum rate permitted by applicable law and GCF shall promptly refund to Seller any interest received by GCF in excess of the maximum lawful rate." See Ex. H Section 16.d.

ITG, as successor in interest to Zoom, any and all interest received in excess of the maximum lawful rate.

363.     This Court is competent to adjudicate the dispute between the parties concerning the Yellowstone Agreements.

364.     Resolution of this dispute will settle and afford relief from uncertainty concerning the parties' respective rights, statuses, and legal relations under the Yellowstone Agreements.

### TENTH CAUSE OF ACTION
### (DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201)
**(as successor in interest to Zoom against the Funderz Defendants)**

365.     ITG repeats and re-alleges the allegations of each of the foregoing paragraphs.

366.     There is an actual, present, justiciable controversy and dispute among the parties that is ripe for resolution under 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, specifically whether the Funderz Agreements charged interest in excess of the highest rate allowable by law.

367.     The Funderz Agreements provided:

> In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that HC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and HC shall promptly refund to Merchant any interest received by HC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that HC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.[14]

---

[14] See Exs. I–K Section 1.10 [ December 12, 2018 Agreement; February 19, 2019 Agreement; March 19, 2019 Agreement].

368.    ITG contends that the Funderz Agreements constituted loans and not the purchase and sale of accounts receivable, whereas the Funderz Defendants contend the opposite.

369.    ITG further contends that payments made by Zoom to the Funderz Defendants constituted repayment of principal and interest thereon.

370.    ITG further contends that the interest rates charged in the Funderz Agreements exceeded the highest rate allowable by law.

371.    ITG, as successor in interest to Zoom, is entitled to a judgment declaring that (i) the Funderz Agreements constituted loans and not purchases of accounts receivable; (ii) the interest rates charged in the Funderz Agreements exceeded the highest rate allowable under law; (iii) the interest rates under the Funderz Agreements must be reduced to the maximum rate permitted by applicable law; and (iv) the Funderz Defendants must promptly refund to ITG, as successor in interest to Zoom, any and all interest received in excess of the maximum lawful rate.

372.    This Court is competent to adjudicate the dispute between the parties concerning the Funderz Agreements.

373.    Resolution of this dispute will settle and afford relief from uncertainty concerning the parties' respective rights, statuses, and legal relations under the Funderz Agreements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor against Defendants, jointly and severally, and seeks a judgment:

    a.  Declaring each of Zoom's agreements with Defendants to be a usurious loan in violation of New York Penal Law § 190.40;

    b.  Declaring that Defendants have charged and received interest under the Yellowstone and Funderz Agreements in excess of the highest rate allowable by law and that Defendants must refund to ITG, as successor in interest to Zoom, any and all interest received in excess of the maximum lawful rate;

    c.  Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined by at trial;

    d.  Awarding treble damages;

    e.  Requiring Defendants to pay Plaintiff's attorneys' fees and costs; and

    f.  Any further relief deemed appropriate by the Court.

Dated: June 23, 2023.

BROOKS, PIERCE, MCLENDON,
 HUMPHREY & LEONARD, LLP

/s/ Daniel D. Adams
Daniel D. Adams
New York Bar No. 4785978
North Carolina Bar No. 51806
 dadams@brookspierce.com
Clint S. Morse
North Carolina Bar No. 38384
*Pro hac vice admission pending*
 cmorse@brookspierce.com
Daniel L. Colston
North Carolina Bar No. 52083
*Pro hac vice admission pending*
 dcolston@brookspierce.com
Post Office Box 26000
Greensboro, NC 27420
Telephone:     336.373.8850
Facsimile:     336.378.1001

*Attorneys for ITG Brands, LLC*