UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ITG BRANDS, LLC,

                Plaintiff,

– against –

YELLOWSTONE CAPITAL, LLC;
WORLD GLOBAL CAPITAL, LLC d/b/a
GRAND CAPITAL FUNDING; CAPITAL
MERCHANT SERVICES, LLC; GREEN
CAPITAL FUNDING, LLC; MIDNIGHT
CAPITAL, LLC; DAVID GLASS;
YITZHAK D. STERN; TSVI DAVIS;
FUNDERZ.NET, LLC d/b/a HOP
CAPITAL d/b/a EMPIRE FUNDING d/b/a
CHAMPION FUNDING GROUP d/b/a
REGION CAPITAL d/b/a FUNDERS
LINK; JOSEPH YITZCHAKOV a/k/a
JOSEPH ISAACOV; and GAVRIEL
YITZCHAKOV a/k/a GABE ISAACOV,

                Defendants.

**OPINION & ORDER**

23-cv-5345 (ER)

RAMOS, D.J.:

      ITG Brands brings this action against a group of merchant cash advance ("MCA") companies and their executives, alleging violations of the Racketeer Influenced and Corrupt Practices Act ("RICO"), and seeking a declaratory judgment. Doc. 15. Before the Court are four motions to dismiss these claims. First, Defendants Yellowstone Capital, LLC ("Yellowstone Capital"); World Global Capital, LLC ("World Global"); Capital Merchant Services, LLC ("Capital Merchant"); Green Capital Funding, LLC ("Green Capital"); Midnight Advance, LLC, sued herein as "Midnight Capital, LLC" ("Midnight Advance"); and Yitzhak Stern (collectively, the "Yellowstone Defendants") move to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 64. Second, Defendants Funderz.net, LLC d/b/a Hop Capital d/b/a Empire Funding d/b/a Champion Funding Group d/b/a Region Capital d/b/a Funders Link

("Funderz") and Joseph Yitzchakov a/k/a Joseph Isaacov ("Joseph" and collectively, the "Funderz Defendants") move to dismiss the claims against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Doc. 69. Third, David Glass moves to dismiss the claims against him pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Doc. 72. Fourth, Gavriel Yitzchakov a/k/a Gabe Isaacov ("Gavriel") moves to dismiss the claims against him pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Doc. 66. For the reasons set forth below, Defendants' motions to dismiss are granted.

## I. BACKGROUND

### A. Factual Background[2]

#### 1. The Parties

##### a. ITG Brands

ITG Brands, a tobacco company, is a Texas limited liability company with a principal place of business in Guilford County, North Carolina. ¶¶ 13, 51–52. ITG Brands is the largest creditor of Zoom Insights, LLC ("Zoom"), a now-bankrupt marketing firm based in North Carolina which is not a party to this action. ¶¶ 1, 13, 25. As explained in more detail below, certain assets of the Zoom estate—namely, Zoom's legal claims against the Defendants—have been purchased by ITG Brands, such that it is the successor in interest to Zoom with respect to those claims. ¶ 25.

##### b. The Yellowstone Defendants

Yellowstone is a New York limited liability company with its principal place of business in New Jersey. ¶ 14. Yellowstone was co-founded in 2009 by David Glass. ¶ 34. Stern is the former chief executive officer ("CEO"), and Davis is the former director of underwriting. ¶¶ 35–36. Glass, Stern, and Davis operate Yellowstone and extend MCAs through Yellowstone and affiliates including World Global, Capital

---

[1] The remaining defendant, Tsvi Davis, was served on August 15, 2023, but has not yet appeared in this action. Doc. 53.

[2] The following facts are based on the allegations in the complaint, which the Court accepts as true for purposes of the instant motion. *See, e.g., Koch v. Christie's Int'l PLC*, 699 F. 3d 141, 145 (2d Cir. 2012). Unless otherwise noted, citations to "¶ _" refer to the complaint, Doc. 15.

2

Merchant, Green Capital, and Midnight Advance. ¶¶ 37–39, 245. These affiliates are all New York limited liability companies with their principal places of business in New Jersey. ¶¶ 15–18. During the relevant time period, Glass, Stern, and Davis controlled the transactions executed by the Yellowstone Defendants. ¶¶ 220–24.

The Yellowstone Defendants are allegedly engaged in a joint enterprise (the "Yellowstone Enterprise") designed to drain businesses of cash by providing MCA agreements which are actually loans with unconscionable repayment terms and which charge usurious interest rates. ¶¶ 4, 65. Specifically, the Yellowstone Defendants utilize a network of sales officers and brokers to sell usurious loans to small businesses in need of cash advances to operate. ¶ 40. These brokers and sales officers allegedly refer to the MCA agreements as "loans." ¶ 42. They represent to small business owners that the "loans" are merely "bridge loans" to provide liquidity while the broker works to secure longer-term financing at lower interest rates. *Id*. In reality, there is no plan to secure such financing. ¶¶ 42–43. Instead, the Yellowstone Defendants' goal is "to keep the businesses surviving, albeit barely, by trapping it in a cycle of high-interest, short-term loans," allowing them to extract as much money as possible in interest and fees before the business collapses. ¶ 43.

    c. *The Funderz Defendants*

Funderz.net is a New York limited liability company with a principal place of business in New Jersey. ¶ 22. Joseph and Gavriel are brothers who operate Funderz through a series of alter egos and assumed names, including Funderz.net, Funders Link, Empire Capital, Hop Capital, and Region Capital. ¶¶ 44–45.

Like the Yellowstone Defendants, the complaint alleges that the Funderz Defendants are also engaged in a joint enterprise (the "Funderz Enterprise") to provide predatory loans disguised as MCA agreements to small businesses. ¶¶ 47–48. The Funderz Defendants also employ brokers and sales officers who refer to the MCA

agreements as short term "loans" and who falsely represent that they are working to secure longer term financing at lower interest rates. ¶¶ 49–50.

   2. *The Agreements*

In 2018, ITG Brands entered multiple contracts with Zoom to provide marketing services for events promoting ITG Brands tobacco products. ¶¶ 51–54. ITG Brands advanced over $24 million dollars to Zoom as prepayments to be used by Zoom to cover the costs of the marketing services. ¶¶ 54, 65. Most of ITG Brands' advances to Zoom went to cover event costs. After applying the cash advances from ITG Brands toward the costs associated with the promotional events, Zoom's actual profit margin was only approximately 7%. ¶¶ 54, 58, 59. Because Zoom had little cash flow after meeting its debt obligations, traditional financing companies refused to lend money to Zoom. ¶ 59. Thus, Zoom turned to MCA companies such as the Defendants.

   a. *The Yellowstone Capital Agreements*

Between June 19, 2017 and December 5, 2017, Zoom entered into three MCA agreements with Yellowstone Capital (the "Yellowstone Agreements"). Pursuant to their terms, Yellowstone Capital agreed to advance to Zoom an amount of money referred to in the agreements as the "purchase price." In return, Zoom paid Yellowstone a fixed portion of its future receipts (the "Specified Percentage") up to a particular amount, referred to in the agreements as the "purchase amount." *See, e.g.*, Doc. 15-3 (June 19, 2017 agreement).[3] The purchase price was purportedly based on the current fair market value of Zoom's future receipts, and payments were to be conditioned on Zoom's sale of products and services and the payment therefore. *Id*. However, the agreements each contained a provision labeled "addendum," which stated that the Specified Percentage

---

[3] Because the Yellowstone Agreements (and the Defendants' other agreements, which are explained in more detail below) are all attached to the complaint, the Court can consider these documents in deciding the instant motions. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citation omitted).

4

was revised to a specific dollar amount which Yellowstone Capital would withdraw from Zoom's bank account per business day. *Id*. The addendum described the withdrawal amount as a good-faith approximation of the Specified Percentage, based on Zoom's receipts. *Id.*

Additionally, each agreement entered into with Defendants contained a choice of law provision that specified that the agreements were governed by New York law. ¶ 29.

The first agreement was entered on June 19, 2017. ¶ 73. Under its terms, Yellowstone agreed to advance to Zoom $50,000 in exchange for a Specified Percentage of Zoom's future receipts, until Zoom repaid Yellowstone $74,950. *Id.* The agreement contained an addendum whereby the Specified Percentage of 20% was revised to a withdrawal of $995 per business day from Zoom's bank account. ¶ 76. Thus, in reality, the agreement was allegedly a loan of $50,000 that required repayment of $74,950 in 75 business days. ¶ 77. This translated into an annual interest rate of at least 300%.[4] *Id.*

Less than one month later, on July 17, 2017, Zoom entered into a second agreement with Yellowstone. ¶¶ 84–85. Yellowstone agreed to advance $100,000 in exchange for a Specified Percentage of 20% of Zoom's future receipts, until Zoom repaid Yellowstone $145,900. *Id.* An addendum replaced the Specified Percentage with a provision that granted Yellowstone the ability to withdraw $1,795 per business day. ¶ 86. The July 17, 2017 agreement allegedly constituted a loan that required repayment of $145,900 in 81 business days, resulting in an effective annual interest rate of at least 235%.[5] ¶ 87.

On December 5, 2017, Zoom entered a third agreement with Yellowstone akin to the previous two agreements. ¶ 94. Yellowstone agreed to advance $80,000 in exchange

---

[4] Due to fees that ITG Brands contends were merely "disguised interest," Zoom was only advanced $45,000 out of the original $50,000 advance. ¶¶ 79–80. Taking this interest into account, ITG Brands represents that the June 19, 2017 agreement had an effective annual interest rate of 482%. *Id.*

[5] Due to fees that ITG Brands contends were actually disguised interest, Zoom only received $31,976 out of the original $100,000 advance, resulting in an effective annual interest rate of 12,745%. ¶¶ 88–90.

5

for a Specified Percentage of 20% of Zoom's future receipts, until Zoom repaid Yellowstone $116,720. *Id.* An addendum to the December 5, 2017 agreement replaced the Specified Percentage of 20% with a daily withdrawal amount, this time in the amount of $1,595, on every business day. ¶ 96. The December 5, 2017 agreement therefore allegedly constituted a loan of $80,000 that required repayment of $116,720 in 73 business days, resulting in an effective annual interest rate of at least 283%.[6] ¶ 97.

  b. *The World Global Agreements*

Between August 3, 2018 and January 7, 2019, Zoom entered into three MCA agreements with World Global (the "World Global Agreements"). ¶ 104. The terms of these agreements largely mirrored the Yellowstone Agreements. Again, each agreement contained a choice of law provision that specified that the agreements were governed by New York law. ¶ 29. As relevant here, the Specified Percentage in the World Global Agreements were also replaced by a daily withdrawal from Zoom's bank account on every business day.

On August 3, 2018, Zoom entered into the first agreement. ¶ 105. Pursuant to its terms, World Global agreed to advance to Zoom $160,000 in exchange for a Specified Percentage of 20% of Zoom's future receipts, until Zoom repaid World Global $239,840. ¶ 105. An addendum replaced the Specified Percentage with a withdrawal of $2,284 per business day from Zoom's bank account. ¶ 107. Thus, the August 3, 2018 agreement allegedly constituted a loan of $160,000 that required repayment of $239,840 in 105 business days, resulting in an effective annual interest rate of at least 172%.[7] ¶ 108.

On September 28, 2018, Zoom entered into the second agreement. ¶ 114. World Global agreed to advance $370,000 in exchange for a Specified Percentage of 25% of Zoom's future receipts, until Zoom repaid World Global $554,630. ¶¶ 114–115. An

---

[6] Due to fees that ITG Brands contends were actually disguised interest, Zoom only received $72,005 out of the original $80,000 advance, resulting in an effective annual interest rate of 456%. ¶¶ 99–100.

[7] Due to fees that ITG Brands contends were actually disguised interest, Zoom only received $145,001 out of the original $156,000 advance, resulting in an effective annual interest rate of 248%. ¶¶ 109–110.

addendum replaced the Specified Percentage with a daily withdrawal of $4,769 on every business day. ¶ 116. Accordingly, the September 28, 2018 agreement allegedly constituted a loan of $370,000 that required repayment of $554,630 within 116 business days, resulting in an effective annual interest rate of at least 147%.[8] ¶ 117.

On January 7, 2019, Zoom entered the final agreement with World Global, where it advanced Zoom $500,000 in exchange for a 25% Specified Percentage of Zoom's future receipts until such time that Zoom repaid $749,500. ¶¶ 124–25. The agreement specified that World Global would be repaid through a daily withdrawal of $7,889 per business day. Thus, the January 7, 2019 agreement allegedly constituted a loan of $500,000 that required repayment of $749,500 within 95 business days, which translated into an effective annual interest rate of at least 200%.[9] ¶ 127.

   c. The Funderz Agreements

In the meantime, between December 12, 2018, and March 19, 2019, Zoom entered into three MCA agreements with Funderz.net, specifically through its alter egos Hop Capital and Region Capital (the "Funderz Agreements"). ¶ 63. The Funderz Agreements provided that Zoom's repayments would occur through daily or weekly withdrawals from its bank account for a finite period of time, which "email records from Hop Capital and Funderz.net email addresses referred to as the 'term' of the transaction." ¶¶ 137, 145, 155. Like the Yellowstone and World Global agreements, each Funderz agreement also contained a choice of law provision that specified that the agreement was governed by New York law. ¶ 29.

Under the terms of the December 12, 2018 Agreement, Hop Capital agreed to advance to Zoom $1,000,000, in exchange for a 10% Specified Percentage of Zoom's future receipts until Zoom repaid $1,430,000. ¶ 135. The purchase amount was to be

---

[8] Due to fees that ITG Brands contends were actually disguised interest, Zoom only received $184,200 out of the original $370,000 advance, resulting in an effective annual interest rate of 1,075%. ¶¶ 118–120.

[9] Due to fees that ITG Brands contends were actually disguised interest, Zoom only received $218,387 of the original $500,000 advance, resulting in an effective annual interest rate of 2,822%. ¶¶ 129–130.

7

paid through weekly withdrawals in the amount of $71,500 from Zoom's bank account, such that the purchase amount would be repaid within 20 weeks or the "term" of the transaction. ¶ 137. In short, the December 12, 2018 Agreement allegedly constituted a loan of $1 million dollars that required repayment of $1.43 million dollars in 20 weeks, resulting in an effective annual interest rate of more than 150%.[10] *Id*.

On February 19, 2019, Zoom entered into a second agreement with Hop Capital, pursuant to which Hop Capital advanced $1,715,000 in exchange for a 10% Specified Percentage of Zoom's future receipts until Zoom repaid $2,401,000. ¶ 142. Zoom's repayments would occur through daily withdrawals from Zoom's bank account in the amount of $17,000 every business day. ¶ 144. Thus, the February 19, 2019 agreement allegedly constituted a loan of $1,715,000 that required repayment of $2,401,000 within 141 business days, or the "term" of the transaction, resulting in an effective annual interest rate of more than 86%.[11] ¶ 145.

One month later, on March 19, 2019, Zoom entered an agreement with another Funderz.net alter ego, Region Capital. ¶ 152. Under the terms of the agreement, Region Capital agreed to advance $400,000 in exchange for a 10% Specified Percentage of Zoom's future receipts until Zoom repaid $640,000. *Id*. Zoom's repayments would occur through daily withdrawals from Zoom's bank account in the amount of $21,333 every business day. ¶ 154. Thus, the March 19, 2019 agreement allegedly constituted a loan of $400,000 that required repayment of $640,000 within 30 business days, or the "term" of the transaction, resulting in an effective annual interest rate of more than 5,775%.[12] ¶ 155.

---

[10] Due to fees that ITG Brands contends were actually disguised interest, Zoom only received $900,000 out of the original $1,000,000 advance, resulting in an effective annual interest rate of 233%. ¶¶ 138–139.

[11] Due to fees that ITG Brands contends were actually disguised interest, Zoom only received $ 852,651 out of the original $1,715,000, resulting in an effective annual interest rate of 573%. ¶¶ 146–148.

[12] Again, due to fees that ITG Brands contends were actually disguised interest, Zoom only received $349,801, resulting in an effective annual interest rate of 18,682%. ¶¶ 156–157.

### 3. *Zoom's Collapse and the North Carolina Litigation*

Zoom became insolvent and unable to continue operations due to the high cost of borrowing under the Yellowstone, World Global, and Funderz Agreements. ¶ 65. The agreements forced Zoom "into a debt-spiral," eventually causing its collapse in July 2019. ¶¶ 6, 64. At the time Zoom collapsed, ITG Brands was its largest creditor, as Zoom owed at least $3.3 million dollars for services ITG Brands had prepaid. ¶ 64; Doc. 77-3 at 4.[13] ITG Brands obtained a judgment against Zoom for its losses. ¶ 56. When ITG Brands learned that World Global and Funderz had taken its advances, it sued in North Carolina state court, alleging violation of North Carolina's Unfair and Deceptive Trade Practices and Uniform Voidable Transactions Acts. ¶¶ 68–69. World Global and Funderz each moved to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim pursuant to North Carolina state law.[14] *See ITG Brands, LLC v. Funders Link, LLC*, No. 20-cvs-7312, 2021 WL 7967391 (N.C. Sup. Ct. June 1, 2021). Following a hearing where the state trial court "heard arguments of counsel and reviewed matters of record," the court found that it did have personal jurisdiction over the defendants and that ITG Brands had "stated claims . . . upon which relief can be granted." *Id.* at *1. Funderz appealed the denial of its motion to dismiss for lack of personal jurisdiction. On July 5, 2022, the North Carolina Court of Appeals affirmed the trial court's decision. *See ITG Brands, LLC v. Funders Link, LLC*, 876 S.E.2d 304, 310 (N.C. App. 2022) ("Plaintiff carried their burden to prove jurisdiction."). ITG Brands thereafter acquired Zoom's claims against the Defendants, including Zoom's potential claims arising under RICO, in a judgment execution sale on May 12, 2023. ¶¶ 70–71.

---

[13] Judicial notice of documents in the North Carolina litigation is appropriate. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of pleadings in other lawsuits as a public record).

[14] *See* N.C. Gen. Stat. Ann. 1A-1, 12.

9

### B. Procedural Background

ITG Brands originally filed this action on June 23, 2023, Doc. 1. The complaint alleges four causes of action against all Defendants: (1) substantive violation of RICO, 18 U.S.C § 1962(c), on behalf of Zoom for the collection of an unlawful debt; (2) a substantive violation of RICO, 18 U.S.C § 1962(c), on behalf of ITG Brands for the collection of an unlawful debt; (3) RICO conspiracy, in violation of 18 U.S.C. § 1962(d); and (4) a declaration pursuant to 28 U.S.C. § 2201 that the Yellowstone, World Global, and Funderz Agreements are void as usurious loans, among other forms of relief. *See* Doc. 15. On November 11, 2023, Defendants filed four separate motions to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Docs. 64, 66, 69, 72.

## II.  LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). When determining if a federal court has subject matter jurisdiction and standing is challenged on the basis of the pleadings, the Court "accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the [the plaintiff]." *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 114 (2d Cir. 2002) (citation omitted). However, the burden remains on the plaintiff, as the party invoking federal jurisdiction, to establish its standing as the proper party to bring this action. *See Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record ... [and the plaintiff must] allege facts

10

demonstrating that he is a proper party to invoke judicial resolution of the dispute." (internal quotation marks and citation omitted)). Further, "[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration in original) (citation omitted).

### B. Federal Rule of Civil Procedure 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681(citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The question in a Rule 12 motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the

11

formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III. DISCUSSION

The complaint asserts substantive RICO and RICO conspiracy claims based on the collection of an unlawful debt. Defendants seek dismissal of these claims, asserting various arguments that occasionally overlap. For the sake of efficiency, the Court will consider the motions together, as ITG Brands did in their opposition.

### A. Constitutional Standing

The Funderz Defendants argue that that ITG Brands lacks Article III standing because it does not have an injury-in-fact as a result of the Funderz Defendants' conduct, as any alleged injury was suffered by Zoom—an entity which is not a party to this litigation.[15] Doc. 70 at 14–15. ITG Brands responds that it has demonstrated such injury—both on its own behalf and because it has standing to bring claims as Zoom's successor. Doc. 77 at 25.

For the purposes of Article III standing, an "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized[ ] and (b) actual or

---

[15] Glass also asserts that because ITG Brands fails to state its RICO claims, there is no basis for the Court to exercise subject matter jurisdiction. *See* Doc. 73 at 7. It is not clear that Rule 12(b)(1) is the proper vehicle for this challenge. *See, e.g.*, *Toretto v. Donnelley Financial Solutions, Inc*, 523 F. Supp. 3d 464, 476 (S.D.N.Y. 2021) ("[B]y challenging the sufficiency of the allegations to plead a cause of action . . . in the context of a Rule 12(b)(1) challenge to Plaintiffs' standing, Defendants again tempt the Court to conflate a merits inquiry with standing."). Because Glass' argument pertains to the merits of ITG Brands' claims, it will not be addressed here.

imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Injury-in-fact is a "low threshold" that "need not be capable of sustaining a valid cause of action. *Ross v. Bank of America, N.A. (USA),* 524 F.3d 217, 222 (2d Cir. 2008).

Here, ITG Brands argues Defendants misappropriated the funds ITG Brands advanced to Zoom, and the allegedly usurious loans were designed to fraudulently transfer value away from Zoom's creditors, including ITG Brands. Doc. 77 at 26–27. These alleged injuries meet the "low threshold" of the injury-in-fact requirement. Economic injuries are a classic example of injury-in-fact. *See, e.g.*, *Transunion LLC v. Ramirez*, 594 U.S. 413 (2021) ("The most obvious [concrete injuries under Article III] are traditional tangible harms, such as ... monetary harms."). Additionally, ITG Brands notes that it acquired Zoom's claims in the North Carolina judgment sale, and no defendant challenges its standing to bring claims as Zoom's successor. Accordingly, the Court concludes that ITG Brands has satisfied the injury-in-fact requirement.

### B. RICO Collection of an Unlawful Debt

Defendants argue that the substantive RICO claims fail because the Defendants' Agreements were for the sale of future receipts and did not collect an unlawful debt. In response, ITG Brands contends the Defendants' Agreements did create unlawful debt in the form of usurious loans.

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

To establish a substantive RICO violation, a complaint must allege that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" or "through ... collection of unlawful debt." 18 U.S.C. § 1962(c);

13

*Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 n.1 (2d Cir. 2013) (internal quotation marks and citation omitted). An "unlawful debt" is a debt that (1) "is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;" and (2) "was incurred in connection with ... the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6); *see Lateral Recovery LLC v. Queen Funding, LLC*, 21-cv-09607 (LGS), 2022 WL 2829913, at *4 (S.D.N.Y. July 20, 2022).

1. *Whether the Agreements Were Usurious Loans*

The Funderz Defendants argue that the Court should apply North Carolina law to determine whether it provided usurious loans. Doc. 70 at 23–24. They argue that even if the MCAs made pursuant to the Funderz Agreements were loans, they would still be legal under North Carolina law because its general usury statute does not apply to loans greater than $25,000. *Id.* at 24 (citing N.C. Gen. Stat. Ann. § 24-1.l). Specifically, the North Carolina usury statute provides:

> (a) Except as otherwise provided in this Chapter or other applicable law, the parties to a loan, purchase money loan, advance, commitment for a loan, or forbearance, other than a credit card, open-end, or similar loan, may contract in writing for the payment of interest not in excess of the following:
>
> (1) Where the principal amount is twenty-five thousand dollars ($25,000) or less, the rate set under subsection (c) of this section.
>
> (2) Any rate agreed upon by the parties where the principal amount is more than twenty-five thousand dollars ($25,000).
>
> [. . .]
>
> (c) On the fifteenth day of each month, the Commissioner of Banks shall announce and publish the maximum rate of interest permitted by subdivision (1) of subsection (a) of this section on that date.

N.C. Gen. Stat. Ann. § 24-1.1. While ITG Brands agrees that Defendants were required to comply with North Carolina law, it argues that the loans are still usurious under the North Carolina Unfair Practices Act. Doc. 77 at 16–17

14

Because the parties agree that North Carolina law applies, the Court will not engage in a choice of law analysis.[16] Instead, the relevant question is whether North Carolina provides a predicate "law relating to usury" that renders the debt unlawful for the purposes of the RICO statute. *See* 18 U.S.C. § 1961(6).

The Court agrees with the Funderz Defendants that the general North Carolina usury law does not apply to loans over $25,000. *See Capparelli v. AmeriFirst Home Improvement Finance Co.*, 535 F. Supp. 2d 554, 564 (E.D.N.C. 2008) (granting dismissal of usury claim in a promissory note action where plaintiffs were loaned $48,001) (citing to § 24-1.1); *W. Raleigh Group v. Mass. Mutual Life Insurance Co.*, 809 F. Supp. 384, 389 (E.D.N.C. 1992) (finding that the usury statute "limits the permissible interest rates on small commercial loans but does not restrict the maximum interest rates that may be charged on larger loans. With respect to such larger commercial loans the parties are free to bargain for any rate, whether fixed or variable, upon which they agree.") (citing to § 24-1.1). A recent case from this District is particularly instructive. In *Haymount Urgent Care PC v. GoFund Advance, LLC*, the court granted defendants' motion for summary judgment on RICO claims for collection on an unlawful debt that were premised on MCA agreements. 690 F. Supp. 3d 167, 176 (S.D.N.Y. 2023). Like in the instant case, the plaintiffs argued that the MCA agreements were usurious loans. *Id*. at 172. However, after finding that North Carolina law applied to the MCA agreements, the court found that the transactions at issue "would not be considered unlawful even if they are loans," since "North Carolina's usury statute does not apply to loans greater than $25,000." *Id*. (citing N.C. Gen. Stat. Ann. § 24-1.1). The Court finds the reasoning in *Haymount Urgent Care* persuasive and therefore finds that § 24-1.1 does not provide a

---

[16] While the Yellowstone, World Global, and Funderz Agreements provide a New York choice of law provision, the Funderz Defendants point out that if ITG Brands is correct that the agreements are usurious loans, then the choice of law provision is also invalidated. Accordingly, the Court would need to engage in a choice of law analysis. *See* Doc. 70 at 22–23. ITG Brands does not argue that the New York choice of law provision should nonetheless apply.

15

state law predicate for ITG Brands' RICO claims based on the collection of an unlawful debt.

ITG Brands counters that a different North Carolina law, the Unfair and Deceptive Trade Practices Act ("UDTPA"), can serve as the state law predicate for its RICO claims. Doc. 77 at 17–18. ITG Brands argues that the North Carolina trial court already determined that it stated a claim under the UDTPA. Doc. 77 at 17 (citing *ITG Brands, LLC v. Funders Link, LLC*, No. 20-cvs-7312, 2021 WL 7967391 (N.C. Super. June 1, 2021).[17]

The UDTPA prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. Ann. § 75-1.1(a). "[C]ommerce' includes all business activities[.]" *Id.* § 75-1.1(b). The UDTPA "does not . . . define an unfair or deceptive act, nor is any precise definition of the term possible." *Bernard v. Central Carolina Truck Sales, Inc.*, 314 S.E.2d 582, 584 (N.C. App. 1984) (internal quotation marks and citation omitted).

In support of its position, ITG Brands argues that other courts have recognized that similar unfair practices laws in other states are designed to combat usury. *See* Doc. 77 at 17 (citing *State ex rel. King v. B & B Investment Group, Inc.*, 329 P.3d 658, 671 (N.M. 2014); *James v. Nat'l Financial, LLC*, 132 A.3d 799, 833 (Del. Ch. 2016)). While that may be true, ITG Brands is unable to cite to any court decision allowing the UDTPA to be used as a state predicate for bringing a RICO claim based on the unlawful collection

---

[17] To be clear, the North Carolina trial court did not consider whether ITG Brands' UDTPA claim could serve as a predicate violation of usury law for the purposes of a federal RICO claim. Instead, it found that ITG Brands' claims, which included an UDTPA claim, "stated claims against Defendants upon which relief can be granted." *ITG Brands, LLC*, 2021 WL 7967391, at *1. Moreover, North Carolina Court of Appeals' review was "expressly limited to the jurisdictional issues presented" and expressed no opinion on the merits. *ITG Brands, LLC*, 876 S.E.2d at 310.

16

of debt. Nor does such an action appear possible. As explained above, an unlawful debt under the substantive RICO statute requires a debt that was assumed "at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). However, the UDTPA does not define any enforceable interest rate.[18] Accordingly, the Court finds that the UDTPA also does not provide a state law predicate for ITG Brands' RICO claims.

In sum, the RICO substantive statute for the collection of an unlawful debt requires the violation of a state or federal usury law. Here, North Carolina's general usury law only applies to loans under the amount of $25,000. Even if ITG Brands succeeded in showing that the Yellowstone, World Global, and Funderz Agreements constituted loans, the amount Zoom borrowed in each transaction with Defendants exceeded $25,000—making the North Carolina usury law inapplicable. As a result, the Court grants Defendants' motions to dismiss the substantive RICO claims against them.[19]

### C. RICO Conspiracy

ITG Brands also brings claims against the Defendants for conspiracy to violate RICO. *See* ¶¶ 260–268; 303–311. To state a claim for RICO conspiracy, a plaintiff must

---

[18] In contrast, § 24-1.1 provides that for loans less than $25,000, the North Carolina Commissioner of Banks will establish a monthly maximum rate of interest. *See* N.C. Gen. Stat. Ann. § 24-1.1(c).

[19] In their papers, individual defendants Gavriel and Glass expressly join the Funderz Defendants' argument on this point. *See* Doc. 67 at 12; Doc. 73 at 16. The Yellowstone Defendants do not argue that the RICO claim fails due to North Carolina usury law, but rather contend that the RICO claims fail under New York law. *See* Doc. 65 at 21–27. As described above, ITG Brands agrees that Defendants were required to comply with North Carolina law. Doc. 77 at 16–17 ("ITG agrees that Defendants are required to comply with North Carolina law, considering they extended loans to a North Carolina business, took money from North Carolina bank accounts, and harmed Zoom and ITG in North Carolina. However, the absence of a specific statute regarding commercial usury does not mean that North Carolina allows unlimited interest rates."). As to whether the Court can grant a motion to dismiss on an alternate legal theory not raised by the Yellowstone Defendants, The Court notes that if a plaintiff is given a meaningful opportunity to be heard on grounds for dismissal, a complaint may be dismissed, even for claims against defendants who did not move. *See Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 499 (S.D.N.Y. 2011), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012). ITG Brands was afforded the opportunity to respond—and indeed, did respond—to the argument that North Carolina usury law does not support their substantive RICO claim. Accordingly, the Court will grant the motion to dismiss made by the Yellowstone Defendants, who did move for dismissal on the same grounds, albeit on a different legal theory.

17

allege "the existence of an agreement to violate RICO's substantive provisions." *Williams v. Affinion Group., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (internal quotation marks and citation omitted).  If a complaint fails to state a substantive RICO claim, it does not state a claim for RICO conspiracy.  *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998); *Nygard v. Bacon*, No. 19-cv-1559 (LGS), 2021 WL 3721347 at *3 (S.D.N.Y. Aug. 20, 2021).  Here, the alleged violations of RICO's substantive provision are predicated on the collection of an unlawful debt.  As explained above, these claims fail to state a claim.  Accordingly, the Court also grants Defendants' motions to dismiss the RICO conspiracy claims against them.

### D. Declaratory Judgment

ITG Brands seeks a declaratory judgment against the Yellowstone and Funderz Defendants pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.  ¶¶ 356–373.  Specifically, ITG Brands seeks a judgment declaring the Yellowstone, World Global, and Funderz Agreements:  (1) constituted loans and not purchases of accounts receivable; (2) the interest rates charged in the agreements exceeded the highest rate allowable under law; (3) the interest rates under the agreements must be reduced to the maximum rate permitted by applicable law; and (4) the Yellowstone and Funderz Defendants must promptly refund to ITG Brands, as successor in interest to Zoom, any and all interest received in excess of the maximum lawful rate.  ¶¶ 362, 371.

In other words, ITG Brands seeks a declaratory judgment that the Yellowstone, World Global, and Funderz Agreements function as usurious loans, and providing associated relief.  However, as explained above, ITG Brands has not established that the Defendants made usurious loans under North Carolina law.  Accordingly, their claims for declaratory judgment as to the Yellowstone and Funderz Defendants are dismissed.

### E. Leave to Amend

ITG Brands also has requested leave to amend the complaint in the event that the Court dismissed its claims. Doc. 77 at 44–45. The Funderz Defendants and Gavriel oppose this request, arguing amendment would be futile because the RICO claims fail as a matter of law. Doc. 70 at 34 n.1; Doc. 67 at 14.

Courts are instructed to "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). Motions to amend are ultimately within the discretion of the district court judge, *Foman v. Davis*, 371 U.S. 178, 182 (1962), who may deny leave to amend for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (citation omitted); *see also Metcalf v. TransPerfect Translations Int'l, Inc.*, No. 19-cv-10104 (ER), 2023 WL 2674743 at *3 (S.D.N.Y. Mar. 29, 2023) ("The party opposing the motion to amend bears the burden of proving the claim's futility."). As to futility, "leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, i.e., if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

Granting leave to amend is a permissive standard since the Federal Rules "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits" of the case. *Conley v. Gibson*, 355 U.S. 41, 48 (1957). Moreover, the Second Circuit has counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims. *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015)).

Because ITG Brands' substantive RICO claim based on the collection of unlawful debt fails as a matter of law, leave to amend the complaint on this basis would be futile.

19

*See Milanese*, 244 F.3d at 110. The Court will therefore deny ITG Brands' request for leave to amend the complaint.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' motions to dismiss the complaint. The Clerk of Court is respectfully directed to terminate the motions, Docs. 64, 66, 69, 72, and 78, and to close the case.

It is SO ORDERED.

Dated:   August 29, 2024
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.